1
2
3
4
5
6
7          **UNITED STATES DISTRICT COURT**

8          **SOUTHERN DISTRICT OF CALIFORNIA**

9

10   FOSTER RICH,                              CASE NO. 09-CV-0652-MMA (WMc)

11                            Plaintiff,       **ORDER GRANTING DEFENDANTS'**
                                               **MOTION TO DISMISS**
          vs.
12                                             [Doc. No. 21]
13   RALPH W. SHRADER, C.G. APPLEBY,
     SAMUEL R. STRICKLAND, JOSEPH E.
     GARNER, DENNIS O. DOUGHTY, et
14   al.,

15                            Defendants.

16

17          Now before the Court is Defendants' motion to dismiss the complaint for failure to

18   state a claim.  Fed. R. Civ. P. 12(b)(6).  The Court submitted the motion on the written

19   briefs.  Local Civ. R. 7.1(d)(1).  For the reasons stated below, the Court **GRANTS**

20   Defendants' motion.

21   **I.      FIRST AMENDED COMPLAINT**

22          Plaintiff Foster Rich compiled rambling speculations into a lengthy First Amended

23   Complaint ("FAC") that alleges his former partners destroyed the firm's honor code and

24   cheated him out of a fortune.[1]  Rather than repeat the 531 paragraphs, the Court

25   ――――――――――――――――――――
            [1]Plaintiff and Defendants submitted several underlying documents.  Bence Am. Decl.;
26   Giltner Decl.  The complaint refers to these documents and they are integral to Plaintiff's
     claims, therefore, the Court considers them as being incorporated by reference.  *United States*
27   *v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).  Except for the Officers' Stock Rights Plan,
     the Court did not refer to most of the exhibits.  In those instances when the Court relied on
28   information outside the complaint to decide this motion, this Order cites the specific document.
                                                                              (continued...)

1  summarizes Plaintiff's basic contentions as follows.

2      Defendant Booz Allen Hamilton, Inc. (hereinafter "Booz Allen" or "BAH") is a

3  strategy and technology consulting firm.  [FAC ¶ 9.][2]  The company was formed as a

4  partnership in 1914, but it re-organized as a corporation (under Delaware law) in 1964.

5  [Id.]  Plaintiff was hired in 1987 as a Vice President.  [Defs.' Ex. C.]  Part of his

6  compensation was the right to purchase stock.  [Id. at 4.]  Plaintiff alleges that Booz Allen

7  "retained the attitude and culture of a partnership, owned and led by a relatively small cadre

8  of corporate officers."  [FAC ¶ 9; id. ¶ 27 (in 2003, Booz Allen had 44 senior vice

9  presidents).]  Plaintiff ascribes the collegial atmosphere at Booz Allen to its bedrock

10  principles and values, including, "an oath that BAH would never be sold, and was held in

11  trust by the current partners for the benefit of future partners."  [Id. ¶ 9; id. ¶ 59 & 100

12  (guiding financial principle that "The Firm will owned by the Partners, with no outside

13  control.").]

14      In September 2003, Booz Allen evaluated Plaintiff's job performance.  Defendant

15  Ralph Shrader (Chairman and Chief Executive Officer) falsely attacked Plaintiff's

16  performance on a 1992 Warbreaker program.  [Id. ¶¶ 166-69.]  Although Plaintiff believed

17  that program had been a success, he thought the evaluation would focus only on the past

18  ten years.  [Id. ¶¶ 168 & 170.]  The written assessment contained positive remarks, but

19  ultimately found that Plaintiff was "[n]ot on track" and recommended that he retire within

20  two years.  [Id. ¶¶ 170-74.]  Plaintiff alleges that at the time he received the evaluation, he

21  disagreed with Shrader's opinion, but he believed that the recommendation to retire was

22  accurate and he planned accordingly.

23  / / /

24  _____

25      [1](...continued)
      As requested, the Court also takes judicial notice that other Booz Allen executives have
26  filed similar lawsuits on the same fact pattern.  Fed. R. Evid. 201; *Lee v. City of Los Angeles*,
    250 F.3d 668, 688-89 (9th Cir. 2001).  These include the *Nemec* action in Delaware, *see infra*
27  footnote 2, and five suits in the Southern District of New York.  Pl.'s Exs. 1-5.

28      [2]Because this matter is before the Court on a motion to dismiss, the Court must accept as true
    the allegations of the complaint in question.  *Hospital Bldg. Co. v. Rex Hospital Trustees*, 425 U.S.
    738, 740 (1976).

The complaint is ambiguous as to whether Plaintiff voluntarily retired or was forced to retire. [*Compare id.* ¶ 527 ("Plaintiff 'retired'") *with* ¶ 175 ("He was terminated").] In October 2004, Plaintiff decided to accelerate his retirement date from September 2005 to March 2005. [*Id.* ¶ 417.] Defendant Dennis Doughty, President of the government division, offered to reverse the retirement recommendation if Plaintiff agreed to stay through September 2005. [*Id.* ¶¶ 417-20.] Because Plaintiff was unhappy with the 2003 evaluation process, he rejected that offer and "proceeded to complete his <u>voluntary</u> retirement on March 31, 2005." [*Id.* ¶ 422 (emphasis added); *see id.* at 1 (Plaintiff "elected" to accelerate retirement date).]

Plaintiff owned 30,500 shares of Booz Allen stock. [*Id.* ¶ 176.] Plaintiff had been granted and purchased those shares throughout his employment pursuant to the Officers' Stock Rights Plan. [*Id.* ¶ 67; Defs.' Exs. A & B.] The Plan provided, in part:

> In the event an Officer ceases to be an employee of the Company or its subsidiaries by virtue of retirement, death, or disability, the Company shall have the right, exercisable at any time following the expiration of 24 months from such event, to purchase all or any portion of the Common Stock held by Officer (or the Officer's estate) at the Repurchase Price in effect at the date of exercise of the Company's right.

[Defs.' Ex. B, ¶ 7(b) (approved in 1988); Defs.' Ex A ¶ 10 (as amended in 2006).] Two years after Plaintiff retired, Booz Allen exercised its right and repurchased all of Plaintiff's stock for millions of dollars in 2007. [FAC ¶ 494-98.]

All would have been well, but for the announcement in May 2008 that Booz Allen sold its government division to the Carlyle Group for $2.54 billion. [*Id.* ¶ 2.] Under the terms of that leveraged buyout, the outstanding shares were repurchased at a materially higher value than book value.[3] [*Id.*] Booz Allen had approximately 300 shareholders, and approximately 44 of them were senior executives. [*Id.* ¶ 9 (in 2007).] The senior executives received substantial sums for the shares, which they had acquired pursuant to

---

[3]The Complaint does not explicitly reveal the value. In a parallel action, executives alleged that the book value in 2008 was $162, but the Carlyle Group paid $700 a share. *Nemec v. Shrader*, C.A. Nos. 3878 & 3934 (Del. filed Apr. 6, 2010). By that math, the book value of Plaintiff's 30,500 shares was approximately $5 million; whereas the Carlyle group would have paid over $21 million.

the Stock Rights Plan during their lengthy service at the firm.  [*Id.* ¶¶ 33, 260.]  Plaintiff alleges that had Booz Allen told him it was going to sell the government division, he would have not have retired in 2005 but would have waited until the deal closed in July 2008 and he would have received an additional $16 million for his shares.  [*Id.* ¶ 2.]  Plaintiff talked to other retired executives about his suspicion that his former colleagues had cheated him, and his investigation revealed the hidden agenda of greed that forms the basis of this action. [*Id.* ¶¶ 437-43.]

Plaintiff complains that Booz Allen changed from a "friendly 44 person quasi-partnership" into a "normal corporation."  [Pl.'s Opp. Br. at 10.]  Plaintiff's theory is that Shrader, with his close associates, engineered a secret plan to split Booz Allen into two divisions so they would control the company.  The scheme commenced in 2003 (or earlier) and culminated in 2008 when Carlyle bought the government division.  Shrader's group forced sixteen senior executives to retire.  [*Id.* ¶¶ 177-260.]  Plaintiff now believes that his treatment during his 2003 performance evaluation was a part of this scheme. [ *Id.* ¶¶ 3, 164-65 (alleging assessment process was changed to further "plan to seize control of the Government Sector by providing a mechanism to purge" opponents), 170-71 (alleging Shrader had assessment altered and Defendant Joseph Garner went along with false review).]  Because Booz Allen re-purchased the shares of its former executives at book value, the plan ensured that Shrader's group benefitted financially when the company was split up and sold to Carlyle.  The Delaware Supreme Court aptly described the financial aspect:  "the pre-Carlyle transaction redemption of [the retired-executive's] shares reduced the number of 'slices' into which the Carlyle transaction 'cake' (a fixed amount) would be cut, thereby enlarging each 'slice' [of the remaining working stockholders]."  *Nemec, supra*, at 20.  Shrader allegedly ensured the success of his hidden agenda by changing the stock plan, implementing a Partnership Compensation Committee ("PCC") to review annual performance, re-structuring and weakening the commercial division, failing to conduct a "bake off" with competing banks, and conducting a "sham" auction that

09CV0652

undervalued the company and did not include an offer by a different strategic buyer (SAIC). [*E.g.*, *id.* ¶¶ 119-257.]

Plaintiff alleges breach of fiduciary duty and breach of contract claims as well as federal racketeering and securities fraud. Plaintiff sued the corporate entity and 23 directors. [*Id.* ¶ 2 (labeling the 23 collectively as "Director Defendants").] The FAC specifically mentions only five executives – Defendants Shrader, Doughty, C.G. Appleby, Samuel Strickland, and Garner. [*See id.* ¶ 3 (labeling this subgroup as "Individual Defendants").] The FAC barely mentions the remaining eighteen directors.[4]

## II.   MOTION TO DISMISS

A complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[C]onclusory allegations of law and unwarranted inferences will not defeat a motion to dismiss for failure to state a claim." *Miranda v. Clark Cnty.*, 279 F.3d 1102, 1106 (9th Cir. 2002). "While legal conclusion can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950.

When the complaint is based upon fraud, the circumstances "shall be stated with particularity." Fed. R. Civ. P. 9(b). The complaint must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985). "The pleader must state the time, place, and specific content of the false representations as well as the

---

[4]DeAnne Aguirre, Heather Burns, Mark Gerenscer, Francis Henry, Christopher Kelly, Daniel Lewis, Joseph Mahaffee, John Mayer, Patrick Peck, Horacio Rozanski, Steven Wheeler, David Knott, and Douglas Swenson filed this motion to dismiss. Five remaining defendants, who live abroad, have not appeared (Shumeet Banerji, Peter Bertone, Christian Berger, Helmut Meier, and Joe Saddi).

identities of the parties to the misrepresentations." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

Ordinarily, leave to amend is granted to allow the plaintiff an opportunity to correct the failure to state a claim; however, a court may deny leave to amend when "the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Id.*

### III.   BREACH OF CONTRACT

Plaintiff's breach of contract claim is based upon his employment contract with Booz Allen.  He alleges that the company "was obligated to provide [him] with an assessment of his performance that was based upon and consistent with the opinion and recommendation of numerous co-workers." [FAC ¶ 524.]  Plaintiff contends that Booz Allen breached that contract in September 2003.  [*Id.* ¶ 525.]  The company did not base his performance review on his co-workers' evaluations (the assessor interviewed twelve employees), which were "very positive," but instead relied on Shrader's false accusation concerning Plaintiff's deficient performance on the Warbreaker project eleven years earlier.  [*Id.* ¶¶ 146-76, 415-25, 526.]  The "Partner Assessment Summary" form was altered to include this false comment and, as a result, to recommend that Plaintiff retire in two years.  [*Id.* ¶¶ 166-76.]

Plaintiff was upset by the faulty assessment, but believed the exercise of business judgment permitted management to replace him, and he "retired."  [*Id.* ¶¶ 415-25, 436, 527.]  The leveraged buy out in 2008 prompted Plaintiff to investigate whether his retirement had been engineered by an improper motive of self-enrichment.  [*Id.* ¶ 436-443.]  Plaintiff alleges that he discovered in March 2009 the corrupt motive and the details of how his performance assessment had been altered.  [*Id.* ¶ 443.]

### A.  Statute of Limitations

Plaintiff filed his original complaint on April 1, 2009.  Defendants argue that the breach of contract accrued in September 2003, when Plaintiff received the assessment.

They contend the claim is barred by the four year statute of limitation which expired in September 2007.  Cal. Civ. Proc. Code § 337.

Plaintiff invokes the discovery rule to postpone the date the limitations period began to run until July 2008, which he contends is when he knew or should have known, with the exercise of reasonable diligence, of the wrongful conduct at issue.  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005); *Kline v. Turner*, 87 Cal. App. 4th 1369, 1375 (2001) (delayed discovery rule provides cause of action does not accrue until plaintiff suspects or should have suspected defendant's wrongdoing).

The current pleading is both factually and legally insufficient.  Because the discovery rule is an exception, the plaintiff must plead facts to show the time and manner of discovery and the inability to have made the discovery earlier despite reasonable diligence. *Fox*, 35 Cal. 4th at 920-21; *McKelvey v. Boeing N. Am. Inc.*, 74 Cal. App. 4th 151, 160 (1999).  The FAC alleges that Plaintiff was aware, on September 11, 2003, that Defendant Shrader was not a member of his assessment group, that Shrader made false accusations at the meeting, and that Defendant Garner also knew the Warbreaker program had been a success.  [FAC ¶¶ 166-69.]  On September 30, 2003, Plaintiff received the written assessment form that notified him "Not on track, not recommended for L3; initiate retirement plan with objective between October 04 and October 05."  [*Id.* ¶ 172.]  Plaintiff contends that this conclusion was inconsistent with other laudatory comments by other partners, and therefore "false and completely contradictory."  [*Id.* ¶ 174.]  These plain allegations indicate that Plaintiff should have been aware that something was amiss in 2003.

Plaintiff attempts to save his claim by arguing he was not aware of the deceptive practice at the time he received his review because Shrader kept his corrupt motive a secret. The Court agrees with Defendants' analysis.  Motive is not an element of a breach of contract action. *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 517 (1994) ("the law generally does not distinguish between good and bad motive for breaching a contract"); *Ruscigno v. Am. Nat'l Can Co., Inc.*, 84 Cal. App. 4th 112, 126 (2000)

(employment contract).  It does not matter that Plaintiff did not suspect that Defendant Shrader had an allegedly secret plan to force out equity partners in order to seize control of Booz Allen for personal financial gain.  Plainly, Plaintiff was aware of the injury (the initiation of a retirement plan) and the cause of the injury (the negative performance review) when he received the assessment in September 2003.  Plaintiff continued to work at Booz Allen until March 2005 and thus had the opportunity to investigate the reason for the negative assessment.  The flaw is apparent on the face of the pleading.

In addition to the hurdle of pleading the facts required to invoke the discovery rule to his claim, Plaintiff faces a legal problem.  The discovery rule generally applies to *tort* claims.  It may apply to a breach of contract claim where plaintiff shows the defendant concealed its improper conduct, the injury or the act causing it would be difficult for plaintiff to detect, the defendant was in a superior position to comprehend the act and injury, and the defendant had reason to believe the plaintiff remained ignorant he had been wronged.  *Gryczman v. 4550 Pico Partners, Ltd.*, 107 Cal. App. 4th 1, 4-6 (2003); *April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 825-33 (1983) (applying discovery rule to breach of contract action when breach committed in secret and plaintiff would not reasonably discover harm until a future time).  The FAC does not allege the facts necessary to trigger the use of the discovery rule on his employment contract.  *See Gryczman*, 107 Cal. App. 4th at 4-6; *April*, 147 Cal App. 3d at 825-33; *El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003) ("There is no need for the discovery rule to apply in the typical breach of contract case" but rule may apply in "unique" cases); *Perez-Encinas v. Amerus Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134-37 (N.D. Cal. 2006) (in summary judgment context, finding no basis to apply discovery rule to breach of contract claim).

## B. Elements

Defendants next argue that the plain terms of the employment contract did not impose a duty on Booz Allen to assess performance "based upon and consistent with the opinion and recommendation of numerous co-workers."  [FAC ¶ 524.]  Defendants refer to

1   the 1987 letter that offered Plaintiff the job, which does not contain that promise.  [Defs.'

2   Ex. C at 3 (listing 5 categories of performance standards).]

3       This argument fails at this stage of the proceedings.  Plaintiff's claim is based upon

4   written personnel policies including the "360 Assessment Process" and a "New Assessment

5   Process" that created implied-in-fact promises.  [FAC ¶¶ 153-63.]  California law allows an

6   employee to state a claim for breach of certain personnel policies and official guidelines

7   that limit the employer's power to terminate an employee.  *Guz v. Bechtel Nat'l, Inc.*, 24

8   Cal. 4th 317, 344-45 (2000).  Under this standard, Plaintiff has pleaded an implied-in fact

9   contract and its breach.  *Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 681-82 (1988).

10       Defendants attack the breach of contract claim for failing to show that the breach

11   was the proximate cause of Plaintiff's damage.  "A proximate cause of loss or damage is

12   something that is a substantial factor in bringing about that loss or damage."  *U.S. Ecology,*

13   *Inc. v. Cal.*, 129 Cal. App. 4th 887, 909 (2005).  Defendants argue that the facts alleged

14   demonstrate there was an intervening event that broke the chain of causation.  *California v.*

15   *Superior Court*, 150 Cal. App. 3d 848, 857 (1984) (citing Cal. Civ. Code § 3300).  Namely,

16   Plaintiff "concedes that despite his qualms with his review and the initial recommendation

17   concerning a plan for retirement, Booz Allen 'offered to cancel the forced retirement,' and

18   that his retirement was in the end wholly 'voluntary.'"  [Defs.' Mot. at 41 (quoting FAC ¶¶

19   1, 422).]

20       Plaintiff argues in his opposition brief that he alleged the offer of reinstatement was

21   inadequate to put him in the position he was in before the negative assessment.  [Pl.'s Opp.

22   Br. at 54.]  He states that he suffered emotional distress from the false information in that

23   unfair assessment and seeks consequential damages.  [FAC ¶ 527; *see id.* ¶ 418.]

24       Defendants' position is well taken.  Even construing the allegations that are set forth

25   in the complaint in Plaintiff's favor, the facts reveal that Booz Allen offered to retract the

26   recommendation to retire if Plaintiff would not accelerate his retirement from September to

27   March 2005.  [*Id.* ¶¶ 416-20.]  "Plaintiff Rich proceeded to complete his <u>voluntary</u>

28   retirement on March 31, 2005."  [*Id.* 422 (emphasis added).]  Plaintiff explicitly identified

the intervening event that broke the chain of causation between the alleged breach and his ultimate decision to retire.  *Franklin v. Murphy*, 745 F.2d 1221, 1228-29 (9th Cir. 1984) (court may dismiss complaint that discloses a fact that necessarily defeats plaintiff's claim), *abrogated on other grounds by*, *Neitzke v. Williams*, 490 U.S. 319, 324 & n.3 (1989), *superceded by statute as recognized in Spivey v. Godinez*, 1997 U.S. Dist. LEXIS 15255, *2 n.1 (N.D. Ill. 1997).

Moreover, the damages that Plaintiff seeks are not recoverable in a contract action. *Applied Equip.*, 7 Cal. 4th at 516 (emotional distress damage is not an available contract remedy).

Further, the Court agrees with Defendants' observation that to the extent Plaintiff attempts to recover consequential damages by measuring the profit he would have made if he had sold his shares to the Carlyle Group, it fails on its face.  California law measures damages for a breach of contract by those which were reasonably foreseeable at the time the contract was formed.  *999 v. C.I.T. Corp.*, 776 F.2d 866, 872 (9th Cir. 1985) (citing California authorities).  "If special circumstances result in an unusual injury, damages cannot be recovered unless those circumstances were known or should have been know by the breaching party *at the time the contract was made.*"  *Id.* (emphasis added).  Booz Allen entered the employment contract with Plaintiff in 1987.  The leveraged buyout took place twenty years later.  The Court holds, as a matter of law, that Plaintiff's theory violates the rule of law measuring contract damages.

For all of the above reasons, the Court **GRANTS** Defendants' motion to dismiss the breach of contract cause of action.

## IV.    TORTIOUS INTERFERENCE WITH CONTRACT

In a related claim, Plaintiff alleges that Defendants Shrader and Doughty interfered with his employment contract with Booz Allen when they reviewed his job performance in bad faith.  [FAC ¶¶ 515-22.]  This claim is based upon the same facts as Plaintiff's breach of contract claim.

"[A] stranger to a contract may be liable in tort for intentionally interfering with the performance of the contract." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (citations omitted).

> The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.

*Id.* (citations omitted).

Defendants move to dismiss the claim on the ground that Shrader and Doughty, as agents of Booz Allen, are not strangers or third-parties to their principal's employment contract. *Applied Equip.*, 7 Cal. 4th at 516-17.

The Court agrees. Agents and employees of a corporation who act in their official capacities on behalf of the corporation "cannot be liable for inducing a breach of the corporation's contract since being in a confidential relationship to the corporation their action in this respect is privileged." *Wise v. S. Pac. Co.*, 223 Cal. App. 2d 50, 72-73 (1963), *abrogated on other grounds by Applied Equip.*, 7 Cal. 4th at 512 n.4 & 510-18.

Plaintiff argues that he has pled around this restriction because he alleges that these senior executives were acting in their personal financial interest and in violation of their fiduciary duty to shareholders. *Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 47 (1989). Plaintiff's theory is that by repurchasing Plaintiff's shares, Defendants increased the percentage of the company that Carlyle would buy, which increased the payout to the directors. [*E.g.*, FAC ¶¶ 5, 50.]

To the extent Plaintiff relies on his naked allegation that Shrader and Doughty breached their fiduciary duty to the shareholders in connection with the sale to Carlyle, the Court rejects that argument for the reasons stated in the *Nemec* decision. As discussed in more detail below, the Delaware Supreme Court rejected the state law claims against Booz Allen on the same facts involved in the instant case. *All* of Booz Allen's shareholders profited from the Carlyle transaction. "The directors did nothing unfair and breached no

fiduciary duty by causing the Company to exercise its absolute contractual right to redeem the retired stockholders' shares at a time that was most advantageous to the Company's working stockholders." *Nemec, supra*, at 13-14. "The fact that some directors were in the group of working stockholders who received a *pro rata* share of the [value of the stock repurchased from retired employees] did not make it an interested transaction." *Id.* at 14. All of the director stockholders, including Shrader and Doughty, "received the same *pro rata* benefit as all other stockholders similarly situated." *Id.* (footnote omitted). "The directors made a rational business judgment." *Id.* Those stockholders who retired before the deal closed were not entitled to special treatment. *Id.*

This claim's second problem is causation. Proximate cause is an element of this tort. *Dryden v. Tri-Valley Growers*, 65 Cal. App. 3d 990, 997-98 (1977). The complaint itself states that Plaintiff voluntarily reject the offer to be reinstated without the retirement recommendation and voluntarily retired. Like the breach of contract claim just discussed, the pleading shows a break in the chain of causation.

In addition, the connection between the 2008 leveraged buy-out and the 2003 performance evaluation is tenuous. The complaint is rather vague on when Booz Allen first considered selling its government business to the Carlyle Group, but the announcement to shareholders states it was first discussed in the months leading up to November 2007. [FAC ¶¶ 255 (alleging early 2007), 389 (quoting Information Circular); *but see id.* ¶ 421 (alleging sale was "actively" considered in 2004).] The current pleading contains no facts to suggest the Carlyle transaction was reasonably foreseeable in 2003.

Finally, this claim fails for a third and separate reason. California's two year statute of limitation governs the tort claim of interfering with a contract. Cal. Civ. Proc. Code § 339; *Anderson v. Allstate Ins. Co.*, 630 F.2d 677, 683 (9th Cir. 1980). As discussed in connection with the breach of contract claim, the claim is barred on the face of the complaint. Though Plaintiff argues that he is invoking the discovery rule to delay the commencement of the statute of limitation, the current pleading lacks factual support for that doctrine.

1    The Court **GRANTS** Defendants' motion to dismiss this claim.

2  **V.    CLAIMS GOVERNED BY THE *NEMEC* DECISION**

3    The complaint alleges three state law claims based on Booz Allen's Stock Rights

4  Plan.[5]  The parties agree that Delaware law applies to claims arising out of the Officer's

5  Stock Rights Plan because it contains a Delaware choice-of-law provision.  [Def.'s Ex. A ¶

6  18 & Ex. B ¶ 14.]  The parties further agree that the decision by the Delaware Supreme

7  Court affirming the Chancery Court's dismissal of parallel claims in the *Nemec* action

8  controls.

9    **A.  Breach of Implied Covenant of Good Faith and Fair Dealing**

10    Plaintiff alleges that Defendants breached the covenant of good faith and fair dealing

11 implied in the Officer's Stock Rights Plan.  [FAC ¶ 493.]  Plaintiff alleges Booz Allen

12 breached the duty when it re-purchased his shares in 2007 because the leveraged buyout by

13 Carlyle "was all but certain to occur."  [*Id.* ¶ 494.]  Plaintiff alleges that the $16 million he

14 would have realized from the Carlyle transaction "went directly to the pockets of the

15 Director Defendants."  [*Id.* ¶ 496.]

16    For the reasons stated by the Delaware Supreme Court in the parallel action, the

17 Court concludes Plaintiff's breach of the implied covenant claim fails as a matter of law.

18 *Nemec*, *supra*, at 10-16.  Booz Allen's Plan explicitly authorized it to purchase its shares at

19 book value two years after an executive retired.  [Defs.' Ex. A ¶ 10 &  Ex. B ¶ 7(b).]

20 Plaintiff "'cannot base a claim for breach of the implied covenant on conduct authorized by

21 the agreement.'"  *Nemec*, *supra*, at 10 (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878

22 A.2d 434, 441 (Del. 2005)).  The bare allegation that the directors were acting in their own

23 self-interest does not save the claim.  Booz Allen and the Directors owe a fiduciary duty to

24 *all* 300 shareholders, and they could not make a special exception for a small group of

25 shareholders who had worked for the company but had already retired.  *Id.* at 13-14.

26 ─────────────────

27    [5]It is unclear who Plaintiff is suing in these three claims, especially when compared to
   the arguments in the briefs.  By its express terms, the Officer's Stock Plan is an agreement with
   the corporate entity.  The Plan delegates certain responsibilities and discretion to the Board of
28 Directors, but Plaintiff would have to allege a breach of this contract that is connected to a
   specific obligation in order to name any of the directors as defendants.

1   The Court **GRANTS** Defendants' motion to dismiss count three with prejudice.[6]

2   **B.  Breach of Fiduciary Duty**

3   Plaintiff alleges a breach of fiduciary duty claim against the Director Defendants on

4   the theory that they decided to repurchase Plaintiff's 30,500 shares when they knew the

5   Carlyle deal was "almost certain" to close and impact the value of the common stock.  FAC

6   ¶¶ 499-504.

7   The Court again adopts the analysis of the Delaware Supreme Court in *Nemec*.

8   Plaintiff's breach of fiduciary duty claim fails as a matter of law because the Plan explicitly

9   authorized Booz Allen to repurchase shares from retired executives.  The Plan controlled

10  the timing of Booz Allen's right (two years after retirement) and the purchase price (book

11  value).  [Defs.' Ex. A ¶ 10 &  Ex. B ¶ 7(b).]  Consequently, the contract supercedes and

12  forecloses the breach of fiduciary duty claim.  Moreover, Plaintiff has not alleged facts to

13  show that the named Defendants had any role in Booz Allen's routine exercise of its

14  contractual right to repurchase its stock.  Nor do the alleged facts demonstrate conduct in

15  the Directors' self-interest that was adverse to the financial interests of the corporation and

16  its shareholders.

17  The Court **GRANTS** Defendants' motion to dismiss this claim with prejudice.

18  **C.  Unjust Enrichment**

19  Plaintiff's unjust enrichment claim against the Director Defendants is also based

20  upon the Officer's Stock Rights Plan, and consequently is governed by the *Nemec* decision.

21  Plaintiff did not oppose the motion to dismiss this cause of action.  The Court agrees with

22  the analysis in *Nemec* that this claim fails as a matter of law.  Plaintiff complains about

23  conduct that is clearly governed by the contract with Booz Allen, thus, there is no valid

24  claim in tort.  In addition, the Carlyle deal benefitted all stockholders equally – the

25  executives who had already retired were not entitled to special treatment.

26  _____

27  [6]In his opposition brief, Plaintiff raises on employment contract to bolster his claim. [Pl.'s Opp. Br. at 55.] The Court does not address this new theory because the third count does not rely on that separate contract.  [*Cf.* FAC ¶¶ 491-98.] Plaintiff's wholesale incorporation

28  of more than four hundred other paragraphs does not give fair notice of this theory.  *See McHenry v. Renne*, 84 F.3d 1172 (9th Cir. 1996).

1    The Court **GRANTS** Defendants' motion to dismiss this claim with prejudice.

2  **VI.    RICO**

3    "The Racketeer Influenced and Corrupt Organizations Act ('RICO') provides a

4  private civil action to recover treble damages for injury 'by reason of a violation of' its

5  substantive provisions." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985)

6  (quoting 18 U.S.C. § 1964(c)). "A civil RICO claim requires allegations of the conduct of

7  an enterprise through a pattern of racketeering activity that proximately caused injury to the

8  plaintiff." *Swartz v. KPMG LLP*, 476 F.3d 756, 760-61 (9th Cir. 2007); *Grimmett v.*

9  *Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (identifying elements).

10    **A.  Alternative Theories**

11    The FAC set forth two alternate theories under the RICO statute, but Plaintiff

12  withdraws the association-in-fact theory pending further factual development.  [Pl.'s Opp.

13  Br. at 30 & 33; *see generally Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007)

14  (discussing associated-in-fact enterprise).]  The Court **DISMISSES** the RICO claim

15  labeled "Count One – RICO" and the dependent conspiracy claim labeled "Count Two –

16  RICO Conspiracy."  [FAC ¶¶ 444-56 & 469-79.]

17    **B.  Person and Enterprise Elements**

18    Defendants move to dismiss the "alternative" RICO count on the ground that it does

19  not allege an enterprise that is distinct from the persons who conducted the pattern of

20  racketeering activity.  [*Id.* ¶¶ 458-68 & 480-90.]  Defendants argue that employees who act

21  in the normal course of their employment are inseparable from the corporation.  [Defs.'

22  Mot. at 20.]

23    The Supreme Court has rejected this argument.  "[T]o establish liability under §

24  1962(c) one must allege and prove the existence of two distinct entities:  (1) a 'person'; and

25  (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."

26  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).[7]  The statute expressly

27  _____

28    [7]The Ninth Circuit's decision in *Living Designs, Inc. v. E.I. DuPont de Nemours & Co.*,
431 F.3d 353 (9th Cir. 2005) does not assist Defendants.  In that case, the plaintiff named the
(continued...)

defines "enterprise" to include a corporation.  18 U.S.C. § 1961(4).  Here, Plaintiff alleges that the "enterprise" is the Booz Allen corporation, and that the "persons" are Shrader and his four "collaborators" Appleby, Strickland, Garner, and Doughty.  [FAC ¶¶ 459-60.]  A corporation is a separate legal entity from its employees.  *Cedric*, 533 U.S. at 163 ("incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs."); *id.* at 164 (RICO "protects the public from those who would unlawfully use an 'enterprise' (whether legitimate or illegitimate) as a 'vehicle' through which 'unlawful . . . activity is committed'") (citations omitted); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1534 (9th Cir. 1992) (corporate entity qualifies as distinct RICO "enterprise" when officers who operate it are the alleged "persons").  "A corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern of activity,' § 1962(c), uses that corporation as a 'vehicle' whether he is, or is not, its sole owner."  *Cedric*, 533 U.S. at 164-65; *Sever*, 978 F.2d at 1534.  The Supreme Court applied this RICO provision to high-ranking employees who act *outside* the scope of their authority.  *Cedric*, 533 U.S. at 165.  Based on this authority, Plaintiff has pled two distinct entities in his Alternative RICO count.

## C.  Pattern of Predicate Acts

Congress defined "racketeering activity" as "any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . which is punishable by imprisonment for more than one year" and other serious crimes, such as fraud.  18 U.S.C. § 1961(1).  A "pattern of racketeering activity" requires at least two predicate acts.  § 1961(5).  "A plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose the threat of continued criminal activity."  *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

---

[7](...continued)
corporate entity as the "person", and incorrectly identified the corporation plus its law firms as the "enterprise."

Plaintiff attempts to plead a pattern of predicate acts solely by reciting the elements of the RICO statute and incorporating his entire complaint. [FAC ¶¶ 461-62.] The complaint states that Defendants violated the mail and wire fraud statutes and committed extortion. [*Id.*] Defendants combed through the verbose complaint to find conduct to match these generic allegations. Plaintiff's opposition does not dispute the Defendants' interpretation of the complaint. [Pl.'s Opp. Br. at 20.] Plaintiff relies on three alleged acts of mail and wire fraud and two acts of extortion.

### 1. Mail and Wire Fraud

Plaintiff alleges the first predicate act was a March 18, 2003 "mailing." [FAC ¶ 120.] He alleges the five key Directors caused the Board of Booz Allen to reduce by one-third the amount of stock to be distributed under the Officer's Stock Rights Plan. [*Id.* ¶ 119.] Plaintiff alleges that the notice gave a false reason for the change. [*Id.* ¶¶ 121-26.] He alleges the real reason was to "maintain Individual Defendants' relative voting strength and make a split-up recapitalization easier of accomplishment." [*Id.* ¶ 126.]

The second predicate act allegedly occurred on September 30, 2003, when Plaintiff received his assessment document. [*Id.* ¶ 173.] He alleges it falsely stated that he should retire, which was part of the overall scheme to gain control of Booz Allen by "purging" executives. [*Id.* ¶¶ 172, 174-75.]

Third, on December 12, 2004, Defendant Shrader sent an email stating that Booz Allen continued to follow the "One Firm" policy. [FAC ¶ 426.] Plaintiff alleges the statement was false because Shrader was considering selling part of the company. [*Id.* ¶¶ 427-34.]

Plaintiff alleges the first act violated the federal mail fraud statute, 18 U.S.C. § 1341, and the second and third violated the wire fraud statute, 18 U.S.C. § 1343. FAC ¶ 462. To plead a predicate act of mail or wire fraud, the complaint must show that defendants (1) formed a scheme to defraud; (2) used the United States mails or wires in furtherance of the scheme; and (3) had the specific intent to deceive. *Schreiber Distrib.*, 806 F.2d at 1399-1400. The specific intent element is satisfied by "the existence of a scheme which was

1   'reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Id.*

2   (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir. 1985)).

3        When a plaintiff relies on charges of wire and mail fraud as the predicate acts of a

4   RICO claim, the factual circumstances of the fraud itself must be pled with particularity as

5   required by Rule 9(b).  *Odom*, 486 F.3d at 554; *Lancaster Cmty. Hosp. v. Antelope Valley*

6   *Hosp. Dist.*, 940 F.2d 397, 405 (9th Cir. 1991).  "Rule 9(b) does not allow a complaint

7   merely to lump multiple defendants together but requires plaintiffs to differentiate their

8   allegations . . . and inform each defendant separately of the allegations surrounding his

9   alleged participation in the fraud."  *Swartz*, 476 F.3d at 764-65 (quotations and alterations

10  omitted); *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 541 (9th Cir. 1989)

11  (plaintiff must identify role of each defendant in the alleged RICO scheme).

12        The Court agrees with Defendants that Plaintiff has not provided the requisite details

13  of who sent the March 18, 2003 mailing to whom.  And while Plaintiff asks the Court to

14  infer that the March 18 notice was sent via United States mail and the September 30

15  document was sent by email, any amended pleading should be specific and eliminate any

16  guess work.  Similarly, Plaintiff has not identified the recipients of the December 12, 2004

17  email.  As written, the FAC violates Rule 9(b).[8]

18        More importantly, the instant pleading fails to allege a plausible scheme to defraud.

19  Shrader's conduct to restructure Booz Allen constituted normal operations of a for-profit

20  corporation.  *See Nemec, supra,* at 13-16 & 18-21 (noting, among other flaws, that the

21  retired executives' legal position sought special treatment, whereas Booz Allen's conduct

22  benefitted all shareholders equally).  The Court agrees with Defendants' criticism that

23  Plaintiff's "allegations are woefully inadequate and unsubstantiated."  [Defs.' Mot. at 10.]

24  To plead fraud as a predicate act of racketeering, Plaintiff must provide more than "a

25  jumble of accusations and suspicions."  [*Id.*]  Plaintiff's attack on Shrader's business

26  decisions is based on hindsight, unreasonable inferences, and labels of illegitimate motives.

27  *See, infra,* pages 31-33 (discussing securities fraud cause of action).

28

---

[8]Plaintiff has these documents, as he attached them to a declaration.  Pl.'s Exs. 6-8.

Moreover, the FAC does not notify Defendants Appleby, Strickland, Garner, and Doughty of their role in the alleged fraudulent scheme; instead, Plaintiff lumps these Directors into a group of "collaborators" with CEO Shrader.  [*E.g.*, FAC ¶ 119 (referring to "the Individual defendants" as a group); *id.* ¶ 182 (same, despite identification of only three defendants in ¶ 177); *id.* ¶¶ 205, 405.]  The sparse allegations against these four executives, like those against Shrader, are conclusory.  [*E.g., id.* ¶ 144-45 (labeling Garner and Doughty as "Shrader loyalists"); *id.* ¶ 169 (alleging Garner "knew" Shrader's evaluation of Warbreaker program was "false"); *id.* ¶ 211 (labeling Garner as "one of Shrader's lieutenants").]  Plaintiff labels conduct as wrongful, when the stated facts appear either wholly innocent, well-within the discretion and job duty of the executive, or unrelated to the theory of his case.  [*E.g., id.* ¶¶ 83 & 346 (Strickland was "acquainted with the mechanics" of a leveraged buy out from prior work experience), *id.* ¶ 99 (Strickland discussed a change in the stock plan that was *rejected*); *id.* ¶ 172 (Doughty completed Plaintiff's retirement recommendation form); *id.* ¶¶ 293-306 (Strickland was part of an operations team that rejected a proposal without giving a reason); *id.* ¶¶ 315-18 (executives bought expensive homes in Florida and commute to work on private jet); *id.* ¶ 413 (listing high salaries); *id.* ¶ 419 (Doughty offered to reinstate Plaintiff).]  Consequently, the FAC does not adequately allege that these four directors had the specific intent to deceive or that they joined a scheme to defraud.  The FAC fails to plead the RICO claim against *each* defendant.  *Swartz*, 476 F.3d at 765 (granting motion to dismiss conclusory RICO allegations against group of defendants); *Moore*, 885 F.2d at 541-42 (granting motion to dismiss RICO claim for failing to specify the role of each defendant).

### 2.  Extortion

Plaintiff alleges two acts of extortion.  He relies on the forced retirement of two senior executives at Booz Allen.  [*E.g.*, FAC ¶¶ 6 & 8.]

Bruce Pasternack joined Booz Allen in 1976 and retired in 2004.  [*Id.* ¶¶ 188-204.] During his 28-year tenure, he accumulated 74,000 shares of common stock.  [*Id.* ¶ 204.]  In 1998, Defendant Shrader was chosen as CEO over Pasternack.  [*Id.* ¶ 188.]  After a

performance evaluation in 2004, Pasternack was told to transition to a part-time consulting position.  [*Id.* ¶ 192.]  Pasternack disagreed with the negative assessment, but at the time, believed it was an independent, unbiased evaluation.  [*Id.* ¶¶ 191, 193-94, 202.]  Plaintiff alleges that Pasternack was told "in no uncertain terms that he must sign the voluntary retirement forms immediately or termination would be initiated."  [*Id.* ¶ 197.]

Reginald Boudinot joined Booz Allen in 1991 and retired in 2007.  [*Id.* ¶¶ 205, 219.]  Plaintiff alleges that, in 2005, Defendant Garner informed Boudinot that his evaluation was "going very poorly; so poorly in fact that members of the PCC [partners compensation committee] were discussing his forced termination for cause."  [*Id.* ¶ 214.]  "Garner made an explicit threat to Boudinot that unless Boudinot immediately retired and granted BAH the option to purchase his shares at book value in two years, BAH would ruin him professionally and financially."  [*Id.* ¶ 221.]  Garner advised Boudinot that he could save valuable employment-related benefits and his reputation if he voluntarily retired.  [*Id.* ¶¶ 215-16.]  "Out of fear of the economic consequences, Boudinot acceded to the demand of Garner and submitted his retirement."  [*Id.* ¶ 219.]  As with the other senior executives, Plaintiff alleges the negative assessment was false and was part of Shrader's scheme to take control of Booz Allen.  [*Id.* ¶¶ 222.]

The RICO Act expressly recognizes an act or threat involving extortion as a predicate act.  18 U.S.C. § 1961(1)(A); *Wilkie v. Robbins*, 551 U.S. 537, 563 (2007).  The federal extortion statute, known as the Hobbs Act, defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  The "obtaining" requirement includes the deprivation of property from a victim and the acquisition of that property by the other.  *Scheidler v. NOW, Inc.*, 537 U.S. 393, 404 (2003).  The property must have some value.  *Id.* at 405 (something "they could exercise, transfer, or sell").  The extortionist must act with the wrongful intent to obtain money or property that he knew he was not entitled to receive or knew he lacked a lawful claim to it.  *Streck v. Peters*, 855 F. Supp. 1156, 1163 (D. Haw. 1994) (citations omitted).

When state law punishes extortion as a felony, "it cannot qualify as a predicate offense for a RICO suit unless it is 'capable of being generically classified as extortionate'" in the traditional sense.  *Wilkie*, 551 U.S. at 567 (quoting *Scheidler*, 537 U.S. at 402-03)).  "[S]uch 'generic' extortion is defined as 'obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats.'"  *Scheidler*, 537 U.S. at 409-10 (quoting *United States v. Nardello*, 393 U.S. 286, 290 (1969)).

"The threat to do that which one is contractually permitted to do is not extortion and cannot possibly fall within any imaginable criminal definition of extortion."  *Zaro Licensing, Inc. v. Cinmar, Inc.*, 779 F. Supp. 276, 283 (S.D.N.Y. 1991); *Peterson v. Philadelphia Stock Exch.*, 717 F. Supp. 332 (E.D. Pa. 1989) (dismissing RICO claim because defendants' use of contractual privileges is not wrongful within meaning of extortion).

The Court must accept as true Plaintiff's allegations that the executives were forced out of the company under false pretenses; however, the Court does not accept his legal conclusion that these facts constitute extortion.  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Rothman v. Vedder Park Mgmt.*, 912 F.2d 315, 317-18 (9th Cir. 1990) (affirming dismissal of RICO claim based on extortion).  The alleged facts describe classic tort and contract claims.  Plaintiff cannot transform them into acts of extortion, with the prospect of trebling damages, simply by labeling them as racketeering.  "[T]he purpose of civil RICO liability does not extend to deterring any illegal act such as retaliatory firings for which there are state and common law remedies."  *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 22-24 (2d Cir. 1990) (collecting employment cases pled as RICO violations, even when employee was fired for refusing to cooperate with his employer's racketeering activity); *Flowers v. Cont'l Grain Co.*, 775 F.2d 1051, 1052-54 (8th Cir. 1985) (dismissing RICO complaint alleging threat of economic loss due to poor job performance, which, if anything, stated a tort claim); *Cardwell v. Sears Roebuck & Co.*, 821 F. Supp. 406, 408-09 (D. S.C. 1993) (threat of being fired from job is not extortion); *Kovian v. Fulton Cnty. Nat'l Bank & Trust Co.*, 647 F. Supp. 830, 835 n.7

09CV0652

(N.D.N.Y. 1986) (disregarding conclusory allegations of extortion as predicate acts in civil

RICO action).  On the facts alleged, Plaintiff's allegation that the executives were deprived

of employment does not satisfy the traditional definition of extortion.[9]  *Scheidler*, 537 U.S.

at 405-10.

Plaintiff's alternate claim that the executives were forced to relinquish company

stock also falls short of stating a claim.  Booz Allen was entitled to re-purchase Boudinot's

and Pasternack's stock two years after they retired.  As the Delaware Supreme Court stated

in the *Nemec* decision, the company as a whole (and all of its 300 shareholders whether

working or non-working) immediately benefitted from the exercise of that right, and when

the Carlyle deal closed in July 2008, all shareholders (including the approximately 100

shareholders who were Directors at Booz Allen) received the same *pro rata* benefit as all

other stockholders similarly situated.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 939 (9th

Cir. 2006).  There was no wrongful acquisition of property by the perpetrators.  *Scheidler*,

537 U.S. at  404.  Moreover, any connection to the premium price paid by the Carlyle

Group in 2008 is too tenuous to support a claim that the five Individual Defendants'

personally benefitted when Pasternack and Boudinot were told to retire.[10]  In any event,

RICO cannot be used to punish conduct in connection with the sale of a security, which

Plaintiff attempts to plead here.  *E.g.*, FAC ¶¶ 204, 219, & 429.  The Court discusses this

bar next.

### 3.  Securities Fraud is Not a Predicate Act of RICO

In 1995, Congress enacted the Private Securities Litigation Reform Act which

amended the RICO statute to eliminate securities fraud as a predicate offense capable of

supporting a RICO claim.  The RICO statute now provides that "no person may rely upon

---

[9]Defendants question whether Pasternack and Boudinot had a property right in continued employment if they were "at will" employees.  Plaintiff's counter argument is that Booz Allen threatened to fire the executives for cause.  To the extent Plaintiff relies on implied-in-fact promises concerning performance standards (discussed above in the breach of contract claim), Plaintiff adequately alleged wrongful conduct.  [FAC ¶¶ 202 & 220.]

[10]Plaintiff relies on the terms of the leveraged buy-out to show that Directors who held shares benefitted "by eliminating a number of persons who would share in the profit."  [FAC ¶ 46; *see e.g.*, *id.* ¶¶ 5, 50-57, 258-60, 320, 390, 405.]

any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c). This bar prevents a plaintiff from artfully pleading other acts (such as mail fraud or extortion) when the wrongful act is based on conduct "in connection with" the purchase or sale of stock that would have been actionable as securities fraud. *Swartz*, 476 F.3d at 761; *accord Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 329-30 (3d Cir. 1999) ("a plaintiff cannot avoid the RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate offenses in a civil RICO action if the conduct giving rise to those predicate offenses amounts to securities fraud").

The clear gravamen of Plaintiff's RICO claim is that he was deprived of the benefit of selling his stock to Carlyle at a premium price in 2008 because Booz Allen bought his shares in 2007. [*E.g.*, FAC ¶¶ 466 & 488 (alleging he lost millions of dollars) & p. 121 (prayer for damages "believed to be in excess of $30 million, trebled pursuant to RICO").] Plaintiff has calculated his damages by the value of his 30,500 shares *if* they had been part of the leveraged buy-out. [*Id.* ¶ 2.] He explicitly states that Defendants' actions to force him to retire (and thus trigger Booz Allen's right to repurchase his stock) without revealing the potential plan to sell the government division "was a manipulative device in connection with the sale of a security." [*Id.* ¶¶ 415-29.]

Plaintiff argues that he should be allowed to plead his RICO claim as an alternative theory to his securities claims until discovery shows whether or not the stock sale was incidental to his RICO injury. However, the Ninth Circuit frequently dismisses securities-based allegations from a RICO cause of action at the pleading stage. *Swartz*, 476 F.3d at 760-61; *see Howard v. Am. Online, Inc.*, 208 F.3d 741, 749 (9th Cir. 2000) (dismissing RICO claim under Rule 12(b)(6) even though plaintiffs did not have standing to bring an alternative claim for securities fraud); *accord Bald Eagle*, 189 F.3d at 328-29 & n.9 (plaintiff's own words demonstrated RICO claim was barred and must be dismissed for failure to state a claim). Here, the flaw is apparent from the current pleading.

/ / /

Plaintiff's brief sets forth a theory that the linchpin of his RICO claim is that Booz Allen failed to offer him a non-confidentiality agreement while he was employed.  [Pl.'s Opp. Br. at 15-20.]  The Court will allow Plaintiff an opportunity to amend his complaint if he disconnects the RICO claim from conduct that "would have been actionable" as securities fraud.[11]  18 U.S.C. § 1964(c).

**D.  Proximate Cause of Injury to Plaintiff's Property**

A RICO plaintiff must have standing.  *Sedima*, 473 U.S. at 496.  Standing is conferred on a plaintiff whose business or property has been injured "by the conduct constituting the violation."  *Id.*; 18 U.S.C. § 1964(c) (remedies available for injury "by reason of" a RICO violation).  The damages must have been proximately caused by the racketeering conduct.  *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258,  265-68 & n. 11 (1992); *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 293-94 (9th Cir. 1990).

**1.  Cognizable Injury to "Business or Property"**

Defendants first argue that Plaintiff has not pled a cognizable injury as defined by the RICO Act.  The FAC alleges loss of employment (including salary and benefits and future opportunities), emotional distress (including a ruined reputation), and millions of dollars.  [FAC ¶¶ 464 & 466.]

To the extent that Plaintiff seeks compensation under RICO for the infliction of emotional distress, it is not a compensable injury as a matter of law.  *Berg v. First State Ins. Co.*, 915 F.2d 460, 464 (9th Cir. 1990).  Nor does RICO compensate for intangible harm to one's business reputation or the potential for future income.  *In re Teledyne Def. Contracting Derivative Litig.*, 849 F. Supp. 1369, 1372 n.1 (C.D. Cal. 1993); *see Berg*, 915 F.2d at 464 (plaintiff cannot recover injury to intangible property interest in RICO claim).

His claim of the loss of millions of dollars might be a concrete injury as defined by RICO; however, to the extent that Plaintiff seeks to measure his financial loss by the price Carlyle paid for Booz Allen shares, it is prohibited by the securities fraud bar.

---

[11]Defendants also argue the FAC fails to allege a "pattern" of racketeering activity. Because each of the purported predicate acts has other problems, the Court reserves ruling on this RICO element.  *H.J., Inc.*, 492 U.S. at 239-40.

09CV0652

1       This leaves Plaintiff with the alleged injury of loss of employment and future

2 opportunities.  The Ninth Circuit held loss of employment and interference with

3 employment opportunities can be a RICO injury in certain circumstances.  *Diaz v. Gates*,

4 420 F.3d 897 (9th Cir. 2005) (en banc) (per curiam) (when Los Angeles Police Department

5 illegally arrested and unjustly incarcerated plaintiff as part of Rampart scandal, his inability

6 to pursue gainful employment was an injury to "business or property" as required by the

7 RICO Act); *Hunt v. Weatherbee*, 626 F. Supp. 1097, 1100-01 (D. Mass. 1986).  The Court

8 **DENIES** Defendants' motion to the extent that Plaintiff has artfully pled loss of

9 employment and employment opportunities as a type of injury recoverable under RICO.

10 *Diaz*, 420 F.3d at 901-02.

11               **2. <u>Proximate Cause</u>**

12       Defendants further argue the alleged RICO violations did not cause the injuries that

13 Plaintiff suffered.  A claim is cognizable under RICO only if there is proximate cause,

14 which "requires careful consideration of the 'relation between the injury asserted and the

15 injurious conduct alleged.'"  *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006).

16 Direct injuries suffice, but remote or attenuated injuries do not.  *Id.* at 458-59; *accord Hemi*

17 *Group, LLC v. New York*, 130 S. Ct. 983, 988-91 (2010) (proximate cause for RICO claim

18 requires "direct relationship" between the fraud and the harm).

19       Defendants argue that Plaintiff's claimed loss of employment and millions of dollars

20 was caused by his own voluntary decision to retire.  They argue that the allegations of mail

21 and wire fraud were not connected to Plaintiff's decision to retire, and the allegations of

22 extortion caused harm to third parties.  *Oregon Laborers-Employees Health & Welfare*

23 *Trust Fund v. Phillip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999) (proximate cause

24 lacking when alleged misconduct injured third parties) (citing *Holmes*, 503 U.S. at 268).

25       Taking the arguments in reverse order, the Court agrees with Defendants' position

26 that the purported extortion of other executives (Pasternack and Boudinot) was not the

27 proximate cause of Plaintiff's alleged RICO injuries.  *Phillip Morris*, 185 F.3d at 963.

28 / / /

               09CV0652

1    Second, as discussed above in connection with the breach of contract claim, the

2    Court found Plaintiff's theory of causation suffers from the obvious intervening event of

3    deciding to retire voluntarily, rather than be reinstated without the recommendation to

4    retire.  This same flaw affects Plaintiff's RICO claim.  His causation theory is tenuous in

5    both fact and logic.  *Hecht*, 897 F.2d at 23-24 (loss of employment too tenuous to be

6    proximately caused by employee's refusal to participate in employer's racketeering

7    scheme).  Nonetheless, the Court will allow Plaintiff leave to amend to cure the deficiency

8    in his proximate cause allegation relative to the loss of employment.  Plaintiff's opposition

9    brief describes a theory that purportedly shows the links between the negative assessment

10   review (which is alleged to be wire fraud) and the false belief that lead him to leave his

11   position at Booz Allen.  [Pl.'s Opp. Br. at 30.] The Court will re-visit the proximate cause

12   issue if Plaintiff chooses to amend his RICO claim.

13   For all of the above-stated reasons, the Court **GRANTS** Defendants' motion to

14   dismiss  "Alternative Count One – RICO."

15       **E.  RICO Conspiracy**

16   Plaintiff's RICO conspiracy claim depends upon the survival of a primary RICO

17   claim.  *Odom*, 486 F.3d at 547; *Avalos v. Baca*, 596 F.3d 583, 593 (9th Cir. 2010) (to plead

18   RICO conspiracy, "plaintiff must show that defendants objectively manifested their

19   agreement to participate in a racketeering enterprise through the commission of two or

20   more predicate crimes").  Accordingly, the Court **GRANTS** Defendants' motion to dismiss

21   "Alternative Count Two – RICO Conspiracy."

22   **VII.   SECURITIES FRAUD**

23    Plaintiff alleges the "Individual Defendants" violated federal and state securities

24   laws by failing to disclose "that certain fundamental long standing BAH policies were

25   under examination."[12]  [FAC ¶ 511.]  Specifically, Plaintiff relies on "the bedrock

26   principle" that Booz Allen would remain "One Firm."  [*Id.* ¶ 529.]  Plaintiff alleges the

27

28   _____
         [12]The FAC names all "Defendants," but Plaintiff states this was an error and that he only
     meant to name the five key Directors and the company.

violation occurred in October 2004, when the partners recommended Plaintiff retire in two years, and again in March 2005, when Plaintiff retired.  [*Id.* ¶ 511; *id.* ¶ 429 (alleging split-up and plan to seize control were "in connection with the sale of a security").]  He alleges that if he had been told that Defendants "had determined to explore and/or effect a Split-up and sale of the Firm," he would have delayed his retirement and benefitted from the six-fold increase in the value of his Booz Allen common stock.  [*Id.* ¶ 434, 511, 512, 514, 531.]

### A.  <u>Federal Securities Fraud Claim</u>

"To state a claim under § 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must show that there has been a misstatement or omission of material fact, made with scienter, which proximately caused his or her injury."  *McCormick v. Fund Am. Co., Inc.*, 26 F.3d 869, 875-76 (9th Cir. 1994); *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996).

A securities complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and if an allegation regarding the statement or omission is made on information and belief, the complaint must state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).  In addition, Rule 9(b) requires a plaintiff to allege fraud with particularity.  *In re Stat Elecs. Sec. Litig.*, 89 F.3d 1399, 1401 (9th Cir. 1996).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  The claim must "state with particularity facts giving rise to a strong inference" that each defendant acted with the intent to defraud or with deliberate recklessness.  15 U.S.C. § 78u-4(b)(2); *Am. West*, 320 F.3d at 931.  The Court accepts as true Plaintiff's allegations; however, with regard to the element of scienter, "the court must consider *all* reasonable inferences to be drawn from the allegations, including inferences unfavorable to the plaintiffs."  *Gompper v. VISX, Inc.*, 298

F.3d 893, 897 (9th Cir. 2002).  "[T]he court ultimately reviews the complaint in its entirety to determine whether the totality of facts and inferences demonstrate a strong inference of scienter."  *Id.* at 895.  The "inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

### 1. <u>Duty to Disclose</u>

Plaintiff's securities claim is based upon a failure to disclose information, as opposed to an affirmative misstatement of fact; consequently, Plaintiff must identify a duty to disclose.  *Basic*, 485 U.S. at 239; *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1157 (9th Cir. 1996) ("Rule 10b-5 is violated by nondisclosure only when there is a duty to disclose.") (citation omitted).  "The person who omitted the material information must have had a duty to disclose it to the person supposedly harmed by the omission."  *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 939 (9th Cir. 2009).

Plaintiff intended to identify the five "Individual Defendants" (*i.e.*, Shrader, Appleby, Strickland, Garner, and Doughty) as the defendants.  Defendants cite clear and controlling authority that these executives did not, as a matter of law, owe any special duty toward Plaintiff as a shareholder.  *E.g.*, *In re Interactive Network, Inc. Sec. Litig.*, 948 F. Supp. 917, 920 (N.D. Cal. 1996) (noting absence of any authority that corporation and vice president had general duty to disclose non-public information).

Moreover, the facts alleged contradict any argument that the Individual Defendants were majority shareholders in relation to Plaintiff and thus owed him a special duty.  *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 188-89 (2d Cir. 1995) (relationship of trust and confidence and unique access to information can give rise to controlling shareholders' duty to disclose material information to fellow director/minority shareholder).  The FAC states the <u>23</u> "Director Defendants" collectively owned only 19% of the shares at the time of the Carlyle transaction.  [FAC ¶ 10.]  Clearly, the smaller subgroup of five "Individual Defendants" were minority shareholders.

/ / /

1    Plaintiff apparently recognizes this problem as his opposition brief states that the

2    claim is also against Booz Allen, the corporation.  Plaintiff argues that the corporation is

3    liable for the misconduct of its executives under the theory of respondent superior.  The

4    parties' written briefs focused primarily on the five Individual Defendants.  The Court will

5    reserve its ruling as to the duty of the corporation until the pleading expressly identifies

6    Booz Allen as the defendant.

7    Plaintiff, however, faces a significant barrier in any attempt to sue Booz Allen for

8    securities fraud.  Plaintiff suggests that he will rely on a line of cases in which a minority

9    shareholder, who was also an employee deciding when to retire, stated a claim against a

10    closely-held corporation.  In those cases, the shareholder/executive was negotiating the

11    terms of his retirement with a corporation that would be exercising its option to re-purchase

12    its stock in accord with the terms of the employment contract.  The courts held the closely-

13    held corporation had a duty to disclose material information, such as a planned merger, or

14    to refrain from repurchasing the executive's shares at book value.  *E.g.*, *McCormick v.*

15    *Fund Am. Co., Inc.*, 26 F.3d 869, 875-76 (9th Cir. 1994) (citing *Smith v. Duff & Phelps,*

16    *Inc.*, 891 F.2d 1567, 1572-75 (11th Cir. 1990) (employee/shareholder retired from closely-

17    held corporation); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 435-39 (7th Cir. 1987)

18    (officer/shareholder resigned from closely-held corporation); *Rizzo v. MacManus Group,*

19    *Inc.*, 158 F. Supp. 2d 297, 302-03 (S.D.N.Y. 2001) (CEO's severance agreement from

20    privately-held corporation); *see Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 175,

21    179 (2d Cir. 2001) (privately-held corporation conceded it had duty to disclose material

22    information to executive, who agreed to resign rather than be fired).

23    Plaintiff describes Booz Allen as a corporation.  [FAC ¶ 9 (alleging Booz Allen

24    changed its legal structure from a partnership to a corporation in 1964).]  As Defendants

25    correctly point out, Booz Allen is not a closely-held corporation.  The FAC itself sets forth

26    that Booz Allen had "approximately 300 stockholders."  Delaware law defines a close

27    corporation as one with less than thirty shareholders.  Del. Code Ann. tit. 8, § 342(a)(1)

28    (2010); *Nixon v. Blackwell*, 626 A.2d 1366, 1380-81 (Del. 1993) (statutes govern corporate

entities).  Thus, those unique principles of law do not apply to Booz Allen.  *See Sprewell*, 266 F.3d at 988-89 (court does not accept factual allegation that is contradicted by own pleading or based on a legal conclusion).

## 2. Materiality of Carlyle Transaction

Even if Plaintiff can establish that Booz Allen had a duty to disclose material information to Plaintiff, he faces the additional hurdle of showing that Booz Allen had material information at the relevant time.  Undisclosed information concerning future events must be reasonably certain to occur before the company must disclose it.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992) (citing *Basic*, 485 U.S. at 232 (where an "event is contingent or speculative in nature, it is difficult to ascertain whether the 'reasonable investor' would have considered the omitted information significant at the time"); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980) (disclosure not required when there is no evidence that estimates were made with such reasonable certainty even to allow them to be disclosed to the public)).  Whether preliminary merger discussions or plans to restructure the corporation are material depends upon the balance of the probability that the event will occur and the anticipated magnitude of the event in light of the totality of the circumstances.  *Basic*, 485 U.S. at 238.

Plaintiff's complaint contains vague hints that Defendant Shrader first conceived his deceptive scheme years before Plaintiff was urged to retire.  [*E.g.*, FAC ¶¶ 2 ("At the time of the redemption, BAH was in the process of selling its government business to private-equity firms"), 63 (alleging September 11, 2001 terrorist attack prompted Shrader to seize control of the government sector), 116, 146, 150, 164 (alleging "by 2003, Shrader concluded" he could eliminate commercial partners and changed assessment method accordingly), & 281 (alleging in 2004 that Shrader decided to extend his term as CEO to execute his secret plan).]  There is a conclusory assertion that the potential "[s]plit-up of the firm was under active consideration" in 2004.  [*Id.* ¶¶ 341, 421, 429.]  These allegations about an overall scheme to force out partners and seize control of the company, however, do nothing to show that Booz Allen was considering selling the government division to

1    Carlyle.  This is the transaction that Plaintiff must show was under discussion in order to

2    establish that it was material information because this deal affected the value of the stock.

3    *McCormick*, 26 F.3d at 876-77.

4        The complaint plainly states that the Carlyle transaction was publicly announced on

5    May 22, 2008 and that Carlyle had developed its bid "in the months leading up to

6    November, 2007."  [FAC ¶ 389-90.]  Nothing suggests the Carlyle transaction was

7    probable in April 2007, when Booz Allen exercised its right to re-purchase Plaintiff's

8    shares.[13]  Defendants cite many cases in which the potential transaction was under tentative

9    discussion, yet, the courts held the negotiations had not advanced to the point of being

10   material.  *E.g.*, *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999);

11   *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 982-85 (S.D.N.Y.

12   1989).  Plaintiff's allegations do not even approach the stage of negotiations involved in the

13   published cases.  He merely states that in mid-2006, the Board of Directors "tasked"

14   Shrader "to explore strategic options to maximize the business prospects of all part of BAH

15   while enhancing shareholder value."  [FAC ¶ 321.]  A generic assignment to make more

16   money is vastly separated from concrete negotiations to sell part of Booz Allen.  As

17   Defendants note, Plaintiff is essentially arguing that Shrader's *thoughts* were material

18   information.  [Defs.' Mot. at 26.]  The "mere intention" to "pursue" or an "unrequited

19   _____

20   [13]For the purpose of deciding this motion, the Court assumes that April 1, 2007 is the
     relevant date, as that is when Booz Allen exercised its contractual right and repurchased its

21   shares (two years after Plaintiff retired).  Defendants argue that Plaintiff made his investment
     decision in either September 2003 (when he received the negative review and recommendation

22   to retire within two years) or April 2004 (when he accelerated his retirement date and rejected
     the offer to be reinstated without the retirement recommendation).  Clearly, if those earlier

23   dates control, the Carlyle transaction was wholly speculative and thus immaterial as a matter
     of law.

24       The Court rejects Defendants' argument concerning fraud "in connection with the
     purchase or sale" of a security.  Plaintiff argues that his decision to retire was "in connection

25   with" Booz Allen's re-purchase of his 30,500 shares.  He alleges he had a security interest in
     his option to sell the shares back to Booz Allen in the two-year window after his retirement.

26   *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130 (9th Cir.), *amended by*, 320 F.3d 905
     (9th Cir. 2002), *abrogated on other grounds as recognized by Proctor v. Vishay*

27   *Intertechnology Inc.*, 584 F.3d 1208 (9th Cir. 2009).  The Court is not persuaded by
     Defendants' attempt to distinguish the line of cases holding that retirement that triggers a stock

28   purchase or sale satisfies that element of a securities claim.  *E.g.*, *Jordan,* 815 F.2d at 436-39
     (stock ownership tied to employment contract was "indirectly or bound up with" decision to
     remain or depart company).

1   desire" to "explore" selling the company at some time in the future is not material

2   irrespective of the importance of the restructuring.  *L.L. Capital Partners, L.P. v.*

3   *Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1180-81 (S.D.N.Y. 1996); *Panfil v. ACC*

4   *Corp.*, 768 F. Supp. 54, 58 (W.D.N.Y. 1991).

5   ### 3. <u>Strong Inference of Scienter</u>

6   The Court agrees with Defendants that the complaint does not contain sufficient

7   facts to create an inference of securities fraud, let alone the strong inference required to

8   survive a motion to dismiss.  The Defendants aptly observe that Plaintiff "asks this Court to

9   infer that the Individual Defendants engaged in a comprehensive, multi-year racketeering

10  scheme apparently starting in 1999 to defraud his fellow senior officers and him by forcing

11  their retirements and not disclosing the existence of a secret plan in the hopes of entering

12  into a then-unknown transaction with a then-unknown partner in order to make money

13  years in the future."  [Defs.' Mot. at 29.]

14  The pleading does not contain any facts directly substantiating Plaintiff's theory.

15  [*Id.*]  The most glaring example is the allegation that the purchase of a home in Florida

16  shows an intent to defraud.  [FAC ¶¶ 315-18.]  The FAC contains numerous assumptions,

17  speculations, and conclusions about Defendant Shrader, but is silent about other

18  Defendants.  The allegations against Shrader fail to create a cogent or compelling inference

19  that he acted with the required state of mind.  The complaint lists Shrader's ordinary

20  business decisions to increase profit and lower costs, and then Plaintiff second-guesses the

21  wisdom of those routine decisions and labels them as fraud.  *Lipton v. PathoGenesis Corp.*,

22  284 F.3d 1027, 1038 (9th Cir. 2002) (generalized assertions that "directors possess motive

23  and opportunity to enhance a company's business prospects" are inadequate to plead

24  scienter).  One example is Plaintiff's criticism that Booz Allen selected Credit Suisse as the

25  investment bank for the leveraged buyout.  Plaintiff does not allege that Credit Suisse was

26  incompetent or had a conflict of interest; rather, he acknowledges that Booz Allen had an

27  existing relationship with the bank.  [FAC ¶ 331.]  The FAC repeatedly and consistently

28  labels Plaintiff's subjective opinions as evidence of an overall scheme to deceive.  [*Id.* ¶¶

322-23.]  He attacks every business decision Shrader made and measures it by his own standard.  [*E.g., id.* ¶¶ 119-120 (in 2003, company reduced by one-third the amount of stock distributed annually "to prevent the firm from being over capitalized which would lead to negative tax consequences and reduce our financial flexibility").]  This includes action beyond Shrader's control.  For example, Plaintiff contends that SAIC, an "industry gem," was an "ideal" company to buy Booz Allen's government sector.  [*Id.* ¶ 360-73; Pl.'s Opp. Br. at 48.]  Plaintiff argues this shows the scheme to undervalue Booz Allen, but the complaint acknowledges SAIC *never made an offer*.  [FAC ¶ 366.]  Plaintiff's *ipse dixit* that SAIC's valuation method shows Booz Allen was undervalued is not supported with fact.  [*Id.* ¶ 401-04.]

Plaintiff's theory also depends on an allegation that Shrader forced senior executives, who by nature of their lengthy employment owned thousands of shares of company stock, to retire as part of his securities scheme.  The equally plausible inference is that the company concluded that these executives' performance had declined, and while the executives disagreed with that opinion, Booz Allen allowed them to continue working until they voluntarily and gracefully retired with full benefits.  [*Id.* ¶¶ 192, 195 (after 28 years service, Pasternack retired six months after negative assessment that "had a negative impact on BAH" ).]  Plaintiff acknowledges that at the time the employment decisions were made, they were grounded in sound business judgment.  [*Id.* ¶ 198 ("Pasternack had no grounds for suspecting that the decision was made in bad faith.").]  There is nothing inherently fraudulent in the situations Plaintiff describes, which at best, might prompt an executive to claim wrongful termination.  Moreover, the forced retirements of sixteen executives over a four year period bear a remote and tenuous connection to the securities fraud claim, because the sale to Carlyle in 2008 benefitted all similarly-situated shareholders equally.  No matter how strong the collegial bond between partners at Booz Allen, the working executives could not show favoritism to the retired executives and they followed the plain language of the Stock Rights Plan to repurchase shares.

/ / /

Plaintiff asserts he discovered the fraud when he learned, in July 2008, about the leveraged buyout and he was disappointed that he had retired three years before the Carlyle Group bought the government division. Plaintiff's personal disappointment, in hindsight, does not create an inference that the conduct was undertaken with an intent to commit securities fraud. Taking into consideration the entirety of the complaint and the inferences both favorable and unfavorable to Plaintiff, the Court finds no plausible inference that the Defendants acted with the required scienter. *Tellabs*, 551 U.S. at 314; *Metzler Inv. GMBH v. Corintian Colleges, Inc.*, 540 F.3d 1049, 1065-69 (9th Cir. 2008).

For all of the above reasons, the Court **GRANTS** Defendants' motion to dismiss the federal securities claim.

### B. State Securities Fraud Claim

California law prohibits a seller or buyer of a security from making untrue statements and misleading omissions. Cal. Corp. Code § 25401. The required level of culpability is recklessness, which "exists when the danger of misleading buyers or seller is so obvious that the defendant must have been aware of it." *Cal. Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 109-10 (2001). The statement "must be made 'for the purpose of inducing the purchase or sale' of a security by another person." *Id.* at 110-12 (interpreting both administrative and private right of actions). "A person must have a specific intent to affect the price of a security in order to induce its purchase or sale." *Id.* California's securities law "does not apply to simple nondisclosure." *Lynch v. Cook*, 148 Cal. App. 3d 1072, 1088 (1983). Privity is required, thus, liability is limited to the actual or literal seller or purchaser. *SEC v. Seaboard Corp.*, 677 F.2d 1289, 1296 (citing Cal. Corp. Code §§ 25401, 25501); *In re Diasonics Sec. Litig.*, 599 F. Supp. 447, 548-49 (C.D. Cal. 1984) (blanket allegation does not satisfy strict privity requirement to each defendant).

Plaintiff's state securities claim fails for substantially the same reasons discussed above in relation to the federal claim. First, Plaintiff incorrectly named the five core directors as defendants—the company, not the individuals, re-purchased Plaintiff's shares after he retired. *Seaboard*, 677 F.2d at 1296 (dismissing state securities claim because

liability is limited to the "actual sellers").  Second, California's securities law does not cover cases of simple non-disclosure.  Plaintiff's complaint is based upon the failure to disclose the Carlyle transaction.  [FAC ¶¶ 530-31.]

In opposition to the motion to dismiss, Plaintiff appears to argue an affirmative misrepresentation of fact.  He argues that Shrader's December 12, 2004 email which "represented that the One Firm Concept and Enduring Value Concept were continuing policies" of Booz Allen was an affirmative misstatement of fact because Shrader was at that time contemplating splitting-up the two divisions and was taking steps to seize control of the company.  [FAC ¶¶ 426-29.]  The FAC refers to "representations that the policy of maintaining BAH as one firm was the bedrock principle of BAH's future strategy."  [*Id.* ¶ 529.]

This is a tenuous theory given the three-year gap between the email and the time Carlyle bid on Booz Allen's government division.  The email is not itself an offer to buy Plaintiff's shares and would not fall within California's statute.  Cal. Corp. Code § 25401 ("It is unlawful for any person *to offer or sell a security* in this state or buy or offer to buy a security in this state *by means of any written or oral communication which includes an untrue statement of material fact* or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading") (emphasis added).  The claim also suffers because Plaintiff has not explained why the statement of a generalized corporate philosophy in 2004 is misleading as to a material fact about an inchoate transaction.  As previously discussed, Plaintiff has not stated facts to support his conclusory assertions about the timing of the Carlyle transaction.  [*Compare* FAC ¶¶ 421, 423 *with id.* ¶ 440.]

Accordingly, the Court **GRANTS** Defendants' motion to dismiss this state law claim.

/ / /

## VIII.  LEAVE TO AMEND

Plaintiff requests leave to amend.  With the exception of the state law theories that are governed by the holding in the *Nemec* litigation, the Court will allow Plaintiff one final opportunity to amend his complaint as to the principal defendants.  *Schreiber Distrib.*, 806 F.2d at 1401.  Following informal discussions with the Defendants, Plaintiff amended his original complaint by doubling its length.  [Doc. Nos. 1, 13, 14, & 16.]  That amended pleading describes routine business decisions which are embellished with blanket assertions of sinister motive.  The Court has reservations about Plaintiff's ability to allege, in good faith, specific facts to support his law suit.  *Pelletier v. Zweifel*, 921 F.2d 1465, 1518-19 (11th Cir. 1991).  Nonetheless, the liberal policy of granting leave to amend permits him an opportunity to cure the deficiencies outlined above as to the key defendants (Shrader, Appleby, Strickland, Garner, Doughty, and Booz Allen Hamilton, Inc.).

Absolutely nothing in the FAC indicates a basis on which to hold the other directors liable on any theory articulated in the complaint.  *Iqbal*, 129 S. Ct. at 1949 (plaintiff must plead "factual content" because Rule 8 "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation"); *Twombly*, 550 U.S. at 554-5 (stating a claim requires "enough factual matter" to suggest an action exists against a defendant).  With minor exceptions, the only fact in the complaint is where each director lives.  [FAC ¶¶ 14-22.]

The body of the complaint briefly mentions only three directors – Mark Gerencser, Horacio Rozanski, and Daniel Lewis – and the opposition brief mentions a fourth – Chief Financial Officer Douglas Swenson.  The passing references concern innocent conduct or conclusions of misconduct (often unrelated).  For example, there is an allegation that Lewis knew about the leveraged buyout in January 2007 and that he did not have a "strong managerial personality."  [*Id.* ¶¶ 255, 276.]  As to Gerencser and Rozanski, *id.* ¶¶ 287, 293, the allegations do not allege any improper conduct by them; rather, they were on a committee that made a proposal that *Shrader* rejected.  [*Id.* ¶¶ 294-95.]  Plaintiff also mentions Rozanski and Lewis in connection with the termination of another executive.  [*Id.* ¶¶ 192, 195, 197.]  Again, the surrounding facts relate to alleged misconduct by *Shrader*.

1   The allegations do not indicate that Lewis had any reason to doubt Shrader's instructions.

2   [*Id.* ¶ 192 ("at Shrader's behest"); *id.* ¶ 196 ("Shrader knew"); *id.* ¶ 202.]  Plaintiff's

3   opposition brief asserts that Swenson owed Plaintiff a fiduciary duty about the stock plan.

4   [Pl.'s Opp. Br. at 22.]

5          The pleading utterly fails to notify these eighteen individuals why they are named in

6   the lawsuit. Fed. R. Civ. P. 8(a); Fed. R. Civ. P. 9; *Semegen*, 780 F.2d at 731 ("Rule 9(b)

7   ensures that allegations of fraud are specific enough to give defendants notice of the

8   particular misconduct which is alleged to constitute the fraud charged so that they can

9   defend against the charge and not just deny that they have done anything wrong.").  The

10  Court dismisses without prejudice the four executives that Plaintiff mentions in passing

11  (Gerencser, Lewis, Rozanski, and Swenson); but the Court dismisses the other fourteen

12  individuals with prejudice because the comprehensive amended pleading is devoid of facts

13  about them (Aguirre, Banerji, Bertone, Berger, Burns, Henry, Kelly, Knott, Mahaffee,

14  Mayer, Meier, Peck, Saddi, and Wheeler).  *See Metzler*, 540 F.3d at 1072 (denial of leave

15  to amend when plaintiff previously amended complaint without judicial guidance); *Lipton*,

16  284 F.3d at 1038-39 (dismissing with prejudice when basic facts show flaws cannot be

17  cured by amendment).[14]

18         The Court was hampered in its review of the FAC by Plaintiff's exclusive reliance

19  on incorporating all 500 paragraphs into every cause of action.  Plaintiff's pleading left the

20  labor intensive task to the Defendants to search for facts related to the RICO and securities

21  claims. *Pelletier*, 921 F.2d at 1518-19.  The Second Amended Complaint, if any, should

22  identify the conduct underlying each claim.  In addition, Plaintiff must identify the specific

23  defendants who are being named in each cause of action.  The FAC omitted this

24  information from some claims, and in other instances, the arguments in the written briefs

25  did not coincide with the defendants mentioned in the pleading.

26  ────────────────

27  [14]Five Defendants live outside the United States.  [FAC ¶¶ 16, 18, & 20.]  Because
    Defendants filed a motion that thoroughly discusses the defects in the complaint and Plaintiff
28  had a fair opportunity to defend his claims, the Court extends the dismissal to those defendants
    who are similarly situated but did not appear. *Abagninin v. AMBAC Chem. Co.*, 545 F.3d 733,
    742-43 (9th Cir. 2008); *Ricotta v. State of Calif.*, 4 F. Supp. 2d 961, 978 (S.D. Cal. 1998).

09CV0652

Conversely, the FAC overflows with superfluous explanations, such as the treatise on compensation models and leveraged buyouts.  [*E.g.*, FAC ¶¶ 27-57, 108-18 (impact of 9/11).]  Plaintiff should exercise professional judgment to ensure that his pleading complies with Rule 8.  Fed. R. Civ. P. 8(a) ("a short and plain statement").

<u>CONCLUSION</u>

For the reasons stated herein, the Court **GRANTS** Defendants' motion to dismiss this action.  The Court **DISMISSES WITH PREJUDICE** Plaintiff's claims for: (1) breach of the implied covenant of good faith and fair dealing (count 3); (2) breach of fiduciary duty (count 4); and (3) unjust enrichment (count 5).  The Court **DISMISSES** all other claims **WITHOUT PREJUDICE** as to Defendants Ralph Shrader, C.G. Appleby, Samuel Strickland, Joseph Garner, Dennis Doughty, and Booz Allen Hamilton, Inc.

The Court **DISMISSES** Defendants Mark Gerencser, Daniel Lewis, Horacio Rozanski, and Douglas Swenson **WITHOUT PREJUDICE**, but **DISMISSES** Defendants DeAnne Aguirre, Shumeet Banerji, Peter Bertone, Christian Berger, Heather Burns, Francis Henry, Christopher Kelly, David Knott, Joseph Mahaffee, John Mayer, Helmut Meier, Patrick Peck, Joe Saddi, and Steven Wheeler **WITH PREJUDICE**.  The Clerk is **INSTRUCTED** to terminate the action against these fourteen individuals.

Plaintiff may file a Second Amended Complaint on or before ***October 18, 2010.***

**IT IS SO ORDERED.**

DATED:  September 17, 2010

Hon. Michael M. Anello
United States District Judge