1

2

3

4

5

6

7

8

9

10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

11

12

13

14

15

16

17

| | |
|---|---|
| FOSTER RICH,<br><br>                                    Plaintiff,<br><br>     vs.<br><br>RALPH W. SHRADER, C.G. APPLEBY, SAMUEL R. STRICKLAND, JOSEPH E. GARNER, DENNIS O. DOUGHTY, et al.,<br><br>                                    Defendants. | CASE NO. 09-CV-0652-AJB (BGS)<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT<br><br>[Doc. No. 48] |

18

19

20

21

22

23

24

25

26

27

28

    Now before the Court is a motion to dismiss Plaintiff Foster Rich's Second

Amended Complaint ("SAC") for "failure to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6). The Court submitted the motion on the written briefs

pursuant to Local Civil Rule 7.1(d)(1). *See* Order Granting in Part and Denying in Part

Joint Motion at 2 ¶ (iii). [Doc. No. 40] For the reasons stated below, the Court **GRANTS**

**IN PART AND DENIES IN PART** the Defendants' motion. [Doc. No. 48] The Court

concludes that Plaintiff has not alleged plausible facts to state a claim for relief under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Employee Retirement

Income Security Act ("ERISA"), and the Securities Exchange Act of 1934. Although

Plaintiff's contract and tort claims appear to be time barred, he has alleged sufficient facts

to invoke the delayed discovery rule, and therefore, these two state law claims survive.

1    I. **Background**

2        A. **Factual Allegations**

3        Defendant Booz Allen Hamilton, Inc. (hereinafter "Booz Allen" or "BAH") hired

4    Plaintiff in 1987.  SAC ¶ 449.  Booz Allen is a consulting firm with both commercial and

5    government divisions.  Plaintiff planned to work at Booz Allen for twenty years.  *Id.* ¶ 449.

6    As a senior executive with military connections, Plaintiff handled the Warbreaker program

7    in 1992-1993.  *Id.* ¶¶ 77, 427.

8        In September 2003, Booz Allen evaluated Plaintiff's job performance.  Defendant

9    Ralph Shrader (Chairman and Chief Executive Officer) allegedly falsely attacked

10   Plaintiff's performance on the Warbreaker program.  The written assessment found that

11   Plaintiff was "[n]ot on track" and recommended that he retire within two years.  *Id.* ¶ 81.

12   In October 2004, Plaintiff was informed that the "termination might be reversed."  *Id.* ¶

13   448.  Nonetheless, he retired in March 2005.

14       At the time of his retirement, Plaintiff owned 30,500 shares of Booz Allen stock.  *Id.*

15   ¶ 5.  Booz Allen shares were not traded on a public market, rather, the outstanding shares

16   were owned by 280 shareholders, who could only sell their shares back to Booz Allen.

17   Plaintiff had purchased his 30,500 shares throughout his tenure as an executive pursuant to

18   the Officers' Stock Rights Plan (hereinafter "Stock Plan").  The Stock Plan provided, in

19   part:

20       In the event an Officer ceases to be an employee of the Company or its
         subsidiaries by virtue of retirement, death, or disability, the Company shall
21       have the right, exercisable at any time following the expiration of 24 months
         from such event, to purchase all or any portion of the Common Stock held by
22       Officer (or the Officer's estate) at the Repurchase Price in effect at the date of
         exercise of the Company's right.
23

24   Defs.' Ex. B, ¶ 7(b) (approved in 1988); Defs.' Ex. A ¶ 10 (as amended in 2006).  Two

25   years after Plaintiff retired, in March 2007, Booz Allen exercised its right and repurchased

26   Plaintiff's stock at book value ($148 per share, for a total of approximately $4.5 million).

27   SAC ¶¶ 90, 432.

28       In May 2008, Booz Allen entered a contract to sell its government division to the

Carlyle Group in a leveraged buyout. *Id.* ¶ 215; *see* Bence Decl. Ex. 2. The deal closed on July 31, 2008. SAC ¶ 299. Outstanding shares were repurchased at $794 per share – significantly higher than the book value. *Id.* ¶¶ 103, 432. Plaintiff consulted with colleagues and concluded that he had been forced to retire as part of an overall plan to deny him the opportunity to profit from the sale of the government division to a private equity firm.[1]

Plaintiff seeks the $21 million he would have received for his accumulated stock had he been an employee of Booz Allen for three more years and been able to sell his shares to Carlyle for the higher price. He alleges that had Booz Allen told him it was going to split up the company and sell the government division, he would not have retired in March 2005, but would have waited until after the deal closed in July 2008. By that time, he would have earned $4.5 in compensation and an additional 3,000 shares of stock. *Id.* ¶¶ 431, 450. His damages total $30 million. *Id.* ¶ 450.

Plaintiff alleges that Shrader, with his close associates, Defendants C.G. Appleby, Samuel R. Strickland, Joseph E. Garner, and Dennis Doughty, engineered a secret plan to split Booz Allen into two divisions, to take control of the company, and to capture the excess market value. Plaintiff believes that his "dishonest and corrupt review of his job performance" in 2003 was part of this "vast illegal scheme." Pl.'s Opp. Br. at 1. Because Booz Allen re-purchased the shares of its former executives at book value, the hidden plan ensured that Shrader's group benefitted financially when the company was split up and sold to Carlyle in 2008. The steps that Shrader took included (1) misleading the executives that Booz Allen would be "Always Owned by the Partners," that is, the senior executives of the corporation, while simultaneously planning to split off the commercial division to sell to a private equity firm as a publicly traded company; (2) eliminating the voting control of the

---

[1] In ruling on a case filed by Plaintiff's colleague Joseph Nemec, the Delaware Supreme Court explained the theory by using the analogy of dividing a cake into slices. *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. Sup. 2010). The "cake" was Carlyle's payment of $2.54 billion for the government division. *Id.* at 1124. Defendants redeemed the shares of retired executives before the Carlyle transaction closed, which "reduced the number of 'slices' into which the Carlyle transaction 'cake' (a fixed amount) would be cut, thereby enlarging each 'slice.'" *Id.*

1    commercial division and sabotaging its ability to make a profit; (3) modifying the Stock

2    Plan to ensure Shrader, as CEO, controlled the vote; (4) forcing a dozen or more senior

3    executives to retire early so that Booz Allen would re-purchase their shares, thereby

4    ensuring enormous profits for the remaining shareholders; and (5) fixing the bidding

5    process to discourage a competitor (SAIC, Inc.) from buying the government division and

6    to allow Carlyle to buy it "at half price."  Pl.'s Opp. Br. at 1; SAC ¶¶ 24-321.

7        **B.  Procedural History**

8        Plaintiff filed his original complaint on April 1, 2009, however, after informal

9    discussions with defense counsel, Plaintiff filed a First Amended Complaint ("FAC") on

10   December 8, 2009.  Defendants moved to dismiss the 122-page pleading.  The Honorable

11   Michael M. Anello granted the motion.  Order Granting Defendants' Motion to Dismiss

12   (hereinafter "Order"). [Doc. No. 36]  The Court described the FAC as a compilation of

13   "rambling speculations" and found numerous flaws in the claims alleged.  Order at 1.

14       The Court dismissed with prejudice three claims brought pursuant to Delaware law

15   because the Delaware Supreme Court had dismissed similar claims in a parallel lawsuit and

16   Plaintiff conceded that the decision applied to his state law claims.  *Id.* at 11 & 14 (breach

17   of fiduciary duty), 13-14 (breach of implied covenant of good faith and fair dealing), 14-15

18   (unjust enrichment).  The Delaware Supreme Court held that *all* shareholders – including

19   the working stockholders – benefitted equally from the sale to Carlyle; Booz Allen had an

20   absolute right to repurchase the stock of retired executives at the most advantageous time;

21   the Stock Plan established the date of the repurchase (two years after retirement) and the

22   price to be paid (book value); and the retired executives were not entitled to special

23   treatment or favoritism.  *Nemec*, 991 A.2d at 1127-30.

24       Given the five-year gap between the recommendation that Plaintiff retire and the

25   Carlyle transaction, the face of the FAC revealed problems with the statutes of limitations.

26   Order at 6-8 (breach of employment contract), 12 (tortious interference with contract); *see*

27   *also id.* at 12, 22, 25, 33-35 (noting remote and tenuous connection between alleged

28   wrongdoing and injury).  In addition, Plaintiff conceded that he had elected to retire in

1  March 2005 when given the opportunity to remain employed, and his voluntary action

2  broke the causal connection between the alleged wrongdoing and his alleged injuries. *Id.* at

3  9-10 (breach of contract), 12 (tortious interference with contract).

4     The Court dismissed the RICO claims because Plaintiff failed to plead conduct that

5  amounted to "racketeering"; failed to allege a plausible scheme to defraud; relied on

6  securities fraud as a predicate act; sought damages that were not recoverable; and did not

7  show his injuries were proximately caused by the alleged RICO violations. *Id.* at 15-26.

8     The Court dismissed the federal and state securities fraud claim because Plaintiff

9  could not establish that Defendants had a duty to disclose non-material information about

10  the future. *Id.* at 26-32 & 34-35.  Finally, Plaintiff's conclusory factual allegations did not

11  create a strong inference that Defendants acted with the intent to defraud. *Id.* at 32-34.

12     Despite its reservations that Plaintiff could plead a plausible theory for relief, the

13  Court allowed "Plaintiff one final opportunity to amend his complaint as to the principal

14  defendants." *Id.* at 36.  The Court, however, dismissed the eighteen directors who were not

15  mentioned in the FAC.[2]  *Id.* at 36-37 & n.14. The Court also denied a motion for

16  reconsideration and clarification.  [Doc. No. 45]     The case was then transferred to

17  this Court's docket.

18     Plaintiff Foster Rich's SAC alleges claims for racketeering in violation of the federal

19  RICO statute, interference with pension rights in violation of the federal ERISA statute,

20

21     [2] In all, Plaintiff named the corporate entity and twenty-three directors.  Judge Anello
22  dismissed Defendants Mark Gerencser, Daniel Lewis, Horacio Rozanski, and Douglas
    Swenson without prejudice to give Plaintiff an opportunity to allege facts showing these
    directors participated in the alleged wrongdoing.   The Court, however, dismissed with
23  prejudice as to Defendants DeAnne Aguirre, Shumeet Banerji, Peter Bertone, Christian Berger,
    Heather Burns, Francis Henry, Christopher Kelly, David Knott, Joseph Mahaffee, John Mayer,
24  Helmut Meier, Patrick Peck, Joe Saddi, and Steven Wheeler because the FAC was silent on
    their role in the alleged scheme.  The Court also instructed Plaintiff not to lump the directors
25  together, but to specify the party sued in each count.  Order at 37.
       The caption of the SAC includes all twenty-three individual directors, but the twelve
26  claims mention only the five principal directors.   It is unclear if Plaintiff was attempting to
    preserve his right to appeal the dismissal of the other eighteen directors, *Loux v. Rhay*, 375
27  F.2d 55, 57 (9th Cir. 1967), or whether this was an oversight (for example, the claims in the
    caption do not match the claims in the body of the complaint).  In any event, because the SAC
28  does not allege any conduct by eighteen individuals, the Court ratifies its dismissal of them as
    parties to the action.

1   and securities fraud as well as breach of contract and tortious interference with contract

2   claims.  [Doc. No. 38]

3   **II.  <u>Standards</u>**

4       **A.  <u>Motion to Dismiss</u>**

5       A complaint must contain sufficient factual matter, accepted as true, to "state a claim

6   to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

7   (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that

8   allows the court to draw the reasonable inference that the defendant is liable for the

9   misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).  "The plausibility

10  standard is not akin to a 'probability requirement,' but it asks for more than a sheer

11  possibility that a defendant has acted unlawfully." *Id.*

12      "Threadbare recitals of the elements of a cause of action, supported by mere

13  conclusory statements, do not suffice." *Id.*  Conclusory allegations of law and unwarranted

14  inferences will not defeat a motion to dismiss for failure to state a claim.  *Manzarek v. St.*

15  *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We need not accept as

16  true conclusory allegations that are contradicted by documents referred to in the

17  complaint.").  "While legal conclusion can provide the framework of a complaint, they

18  must be supported by factual allegations." *Iqbal*, 129 S. Ct. at 1950; *Warren v. Fox Family*

19  *Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) ("We do not necessarily assume the

20  truth of legal conclusions merely because they are cast in the form of factual allegations.")

21  (alterations in quotation and citation omitted).

22      When the complaint is based upon fraud, the circumstances "shall be stated with

23  particularity."  Fed. R. Civ. P. 9(b); *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir.

24  1985).

25      A court may deny leave to amend when "the allegation of other facts consistent with

26  the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v.*

27  *Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).

28  / / /

1    **B.  <u>Documents Outside the Complaint</u>**

2    As a general rule, the court "may not consider any material beyond the pleadings in

3    ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir.

4    2001) (internal citation and quotation marks omitted).  The court may, however, consider

5    materials that are submitted with and attached to the complaint, as well as unattached

6    evidence on which the complaint "necessarily relies" if:  (1) the complaint refers to the

7    document; (2) the document is central to the plaintiff's claim; and (3) no party questions the

8    authenticity of the document.  *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *Lee*,

9    250 F.3d at 688.

10   As in the first motion, Defendants submit the Officers' Stock Rights Plan.  Giltner

11   Decl., Exs. A- B.  (There are two versions, but parties have not identified any material

12   differences between the Plan that was approved in 1998 and version amended in 2006.)

13   The Stock Plan is integral to Plaintiff's claims, therefore, the Court considers it as being

14   incorporated by reference.  *United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003).

15   In addition, Defendants submitted the "2003 Swenson Memo" that Plaintiff

16   describes in the SAC.  Giltner Decl. Ex. C.  Both parties rely on the Memo in their briefs.

17   Accordingly, the Court deems the Memo incorporated by reference into the complaint.

18   *Ritchie*, 342 F.3d at 907-08.

19   Plaintiff submitted three outside documents.  Bence Decl. Exs. 1-3.  Plaintiff first

20   submits a list of the 280 Booz Allen shareholders as of February 15, 2006.  *Id.* Ex. 1.  The

21   second attachment is one page of the prospectus that Booz Allen filed with the Securities

22   and Exchange Commission in 2010.  It describes the acquisition of the government

23   consulting business by the Carlyle Group.  *See* SAC ¶¶ 294-95.  The final exhibit is from

24   the parallel case filed by other retired employees in the Southern District of New York.

25   Plaintiff attaches the motion to dismiss that the same defendants in this action filed in that

26   related case.  Defendants do not object to Plaintiff's three documents and the existence of

27   these external documents appears to be suitable for judicial notice.  Fed. R. Evid. 201; *Lee*,

28   250 F.3d at 689-90 (taking judicial notice of existence of "matters of public record," but

1  not of *facts contained* in the document that may be "subject to reasonable dispute").

2  **C. Allegations Omitted from SAC**

3  In several instances, Judge Anello dismissed claims in the FAC because Plaintiff's

4  complaint contained inconsistent and self-defeating allegations of fact. *E.g.*, Order at 7

5  (dismissing contract claim as barred by statute of limitations because Plaintiff alleged he

6  knew of breach at time it occurred); *id.* at 9, 12, & 25 (Plaintiff's allegation that he

7  voluntarily retired after rejecting an offer to be reinstated broke the causal chain to his

8  alleged damages); *id.* at 29 (Plaintiff's characterization of a partnership was inconsistent

9  with fact that Booz Allen was a corporation); *id.* at 30-31 (allegations of dates of Carlyle

10  transaction showed it was not contemplated until late 2007, after Plaintiff retired).

11  Plaintiff's amended pleading omits those self-defeating passages.

12  Defendants attack Plaintiff's artful pleading. They argue Plaintiff is bound by the

13  prior inconsistent allegations. Defendants rely on an unpublished order from a district

14  court for the proposition that a "district court is not required to accept as true allegations in

15  an amended complaint that, without any explanation, contradict an earlier complaint."

16  *Stamas v. Madera*, 2010 WL 2556560, at * 2 (E.D. Cal. June 21, 2010).

17  While Defendants' frustration with Plaintiff's maneuver is justified, the case law

18  does not support their legal argument. As an unpublished decision from another district

19  court, *Stamas* is not binding authority. A close examination of the statement also reveals

20  that the case is not persuasive authority. The *Stamas* decision cited *Ellingson v. Burlington*

21  *Northern, Inc.*, 653 F.2d 1327, 1329-30 (9th Cir. 1981) as support for the point of law.

22  *Ellingson*, however, involved factual allegations that contradicted an underlying document.

23  The *Ellingson* case stands for the well-established rule that, when ruling on a motion to

24  dismiss a complaint, "[t]he Court need not, however, accept as true allegations that

25  contradict matters properly subject to judicial notice or by exhibit." *Sprewell v. Golden*

26  *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (arbitration award); *Bertucelli v.*

27  *Carreras*, 467 F.2d 214 (9th Cir. 1972) (allegation that magistrate had not signed arrest

28  warrant was contradicted by the warrant itself).

By contrast, here, Defendants seek to extend that rule to allegations of fact in a prior complaint.  The Ninth Circuit expressly held that such a rule does not necessarily apply to a prior complaint.  *PAE Gov't Servs., Inc. v. MPRI, Inc.*, 514 F.3d 856 (9th Cir. 2007).  A district court cannot strike or ignore allegations in an amended complaint that apparently contradict an earlier iteration.  *Id.* at 858 ("Even assuming that the two pleadings were irreconcilably at odds with each other, this would not, by itself, establish that the later pleading is a sham.").  By finding a factual allegation "unfounded" because it may conflict with an prior complaint, the court would be adjudicating the merits.  *Id.*  Plaintiffs are permitted to plead in the alternative "even if the alternatives are mutually exclusive."  *Id.* at 859.  Moreover, factual assertions in a complaint "are considered judicial admissions conclusively binding on the party who made them" *unless*, as here, they have been amended.  *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).  Thus, Defendants' argument fails in the context of a motion to dismiss.  The Court must examine the pleading that is currently before it – the SAC.  *Loux v. Rhay*, 375 F.2d 55, 57 (9th Cir. 1967); *accord Lacey v. Maricopa Cty.*, Nos. 09-15703, 09-15806, 2011 WL 2276198, at *15 (9th Cir. June 9, 2011).

Although the Ninth Circuit repeatedly states an amended complaint may only allege other facts "consistent" with the challenged pleading, *Reddy v. Litton Indus., Inc.*, 912 F.2d 291, 296-97 (9th Cir. 1990), Defendants have not cited any authority that bars a plaintiff from omitting troublesome facts in his amended complaint.  Nor have Defendants pointed to a specific instance in the SAC when Plaintiff directly contradicted a fact allegation made in the FAC.  It is settled law that the "'amended complaint supercedes the original, the latter being treated thereafter as non-existent.'"  *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1474 (9th Cir. 1997) (quoting *Loux*, 375 F.2d at 57).  The Ninth Circuit's recent decision in *PAE*, 514 F.3d at 858-59, accepts that "parties are often uncertain about the facts" at the time of filing the complaint, but "[a]s the litigation progresses, and each party learns more about its case and that of its opponents, some allegations fall by the wayside as legally or factually unsupported."  Thus, the presence of inconsistent, or even mutually-exclusive,

1    allegations is accepted as part of litigation.  *Id.* at 859.

2    **III.  ERISA**

3         Plaintiff alleges four ERISA claims.  These claims were not alleged in the original

4    complaint.  First, he alleges that he was a participant in BAH's "Stock Plan" from 1987 to

5    March 2007 (when BAH repurchased its stock), and in the separate "Retiree Plan" from

6    March 2005 (when he retired) to March 2007.  SAC ¶ 404; *id.* at ¶ 305.  Plaintiff

7    characterizes the payment of book value as a "lump sum benefit payment" that materially

8    undervalued the true fair value of his "retirement benefits."  *Id.* ¶¶ 405-09.

9         Second, he alleges that BAH, Shrader, Appleby, and Strickland interfered with his

10   ERISA rights by expelling him from the company.  *Id.* ¶¶ 377-86.  He alleges that Shrader,

11   Appleby, and Strickland were the administrators of the Stock Plan and that their conduct

12   violated their fiduciary duties.  "Plaintiff was deprived of more than $18.5 million in gain

13   he would have enjoyed under the terms of the Sale and Split-up Transaction, some of which

14   deprived funds went directly to the pockets of the Administrators . . . ." *Id.* ¶ 383.

15        Third, Plaintiff relies on an implied covenant of good faith and fair dealing, *Id.* ¶

16   388; and, fourth, he seeks attorneys' fees from BAH and Shrader for his ERISA claims.  *Id.*

17   ¶¶ 410-15.

18        Defendants move to dismiss the ERISA claims on several grounds.  The Court finds

19   the first argument dispositive and therefore does not address Defendants' other arguments.

20   The Court agrees with Defendants that the Stock Plan does not qualify as an "employee

21   pension benefit plan" or "employee welfare benefit plan" as defined by ERISA and its

22   regulations.  29 U.S.C. § 1002(1) & (2); 29 C.F.R. § 2510.3-2(c); *Inter-Modal Rail Emps.*

23   *Ass'n. v. Atchison, Topeka & Santa Fe Ry. Co.*, 520 U.S. 510 (1997).

24        "[M]ost courts have uniformly held that an incentive stock option plan is not an

25   ERISA plan."  *Oatway v. Am. Int'l Grp., Inc.*, 325 F.3d 184, 187 (3d Cir. 2003); *accord*

26   *Emmenegger v. Bull Moose Tube Co.*, 197 F.3d 929, 931-34 (8th Cir. 1999); *Hahn v. Nat'l*

27   *Westminister Bank, N.A.*, 99 F. Supp. 2d 275, 279 (E.D.N.Y. 2000); *Kaelin v. Tenneco,*

28   *Inc.*, 28 F. Supp. 2d 478, 486-87 (N.D. Ill. 1998) (collecting cases).  Courts examine factors

1    such as (1) the express purpose of the plan; (2) whether the employer has discretion to

2    award the benefit; (3) whether the bonus is for work performed; (4) whether "payments are

3    systematically deferred to the termination of covered employment or beyond, or so as to

4    provide retirement income to employees," 29 C.F. R. § 2510.3-2(c); (5) how the company

5    promoted the plan; and (6) whether penalties were imposed to deter redemption before

6    retirement. *Oatway*, 325 F.3d 188-94; *Emmenegger*, 197 F.3d at 933; *Kaelin*, 28 F. Supp.

7    2d at 487.  Courts examine the totality of the surrounding circumstances from the point of

8    view of a reasonable person. *Kaelin*, 28 F. Supp. 2d at 484.

9         Applying the relevant factors to the instant Stock Plan, the Court finds, as a matter

10   of law, that it is not covered by ERISA.  The stated purpose of the Plan is to enable top

11   executives to buy Booz Allen stock "and to provide incentives for such Officers to continue

12   to serve as employees of the Company and its subsidiaries."  Giltner Decl. Ex. A at 1.  The

13   Plan documents further states that "[t]he economic benefits" of participating "shall not be

14   deemed to be compensation for purposes of determining any Officer's eligibility for, or

15   participation in, the Company's *retirement*, insurance or other benefit programs." *Id.* at 7,

16   ¶ 17 (emphasis added).  Taken together, these two express statements show that BAH's

17   Stock Plan was not designed for the purpose of paying retirement income (because there

18   was a separate retirement program); rather, it was a supplement to regular compensation

19   that rewarded an employee's loyalty to the company. *Oatway*, 325 F.3d at 188-89; *Murphy*

20   *v. Inexco Oil Co.*, 611 F.2d 570, 575-76 (5th Cir. 1980).

21        In reaching this decision, the Court rejects Plaintiff's bald assertion that the Stock

22   Plan "has two separate schemes, one for active employees and one for retirees."  Pl.'s Opp.

23   Br. at 4 n.4; *e.g.*, SAC ¶¶ 20-23, 305-07. The Court is not bound by Plaintiff's legal

24   conclusions about the structure and operation of the Plan as the Plan document speaks for

25   itself. *E.g.*, SAC ¶ 20; *Manzarek*, 519 F.3d at 1031; *Sprewell*, 266 F.3d at 988 ("The court

26   need not . . . accept as true allegations that contradict matters properly subject to judicial

27   notice or by exhibit."); *see Warren*, 328 F.3d at 1141 n.5.

28        The Plan provided "sole discretion" to the Board of Directors to decide which

officers could buy shares and the number of shares they could purchase.  Giltner Decl. Ex. A at 2, ¶ 2.  This fact indicates the Plan is not covered by ERISA.  *Oatway*, 325 F.3d at 188-89.

The Stock Plan placed restrictions on the employee's award, but the rules operate in a manner that is consistent with a classic bonus plan.  The Stock Plan contained various restrictions depending upon the reason an officer ended his employment.  Giltner Decl. Ex. A at 3-5 (covering leave of absence, termination by death, disability, or retirement, etc.).  The Plan was further restricted in that Booz Allen was a closed corporation and retained the right to repurchase stock from an employee at a set price.  *Id.* at 4, ¶ 10; *id.* at 6 ¶ 13 ("No Officer shall sell, assign, pledge, or otherwise encumber, or dispose of any rights under this Plan or any shares" held by him, except by gift with prior Board approval); *id.* at 7, ¶ 16 (spouses with community property interests must also abide by terms of Plan).  For officers who retired, the company had the right to repurchase the shares twenty-four months after the date of separation.  *Id.*  It is possible for officers to have some income deferred to them during the first two years of their retirement, but that is an incidental impact.  *Oatway*, 325 F.3d at 189; *Murphy*, 611 F.2d at 576; *Int'l Paper Co. v. Suwyn*, 978 F. Supp. 506, 510-11 (S.D.N.Y. 1997).  There is no systematic deferral of income into the retirement years.  *Emmenegger*, 197 F.3d at 933; *Kaelin*, 28 F. Supp. 2d at 486-87.  The structure of BAH's Stock Plan allows existing employees to acquire wealth, the award of shares was not conditioned upon retirement, and shareholders could redeem their shares at any time.  *Emmenegger*, 197 F.3d at 933.

In opposing the motion to dismiss the SAC, Plaintiff argues that the Stock Plan has three characteristics of a retirement plan.

First, Plaintiff argues the Stock Plan contains a penalty.  If an officer failed to exercise the stock right within sixty days, "the grant of Stock Rights shall be deemed to be cancelled."  Giltner Decl. Ex. A at 2, ¶ 3 & 3, ¶ 4.  Plaintiff characterizes this term as a penalty and argues this fact negates the concept of a bonus payment.

The Court does not agree with Plaintiff's characterization.  The clause is not a

penalty that deters employees from redeeming shares.  The short time limit to exercise an award indicates that the stock grant is a limited opportunity to reward performance.  The fact that an employee may forfeit an award of stock indicates that it is not primarily intended to fund one's retirement.  *See Int'l Paper*, 978 F. Supp. at 511-12.

Second, Plaintiff states that no executive ever sold his stock back to Booz Allen and that the 10% to 17% per annum growth factor built into the Stock Plan encouraged executives to retain the stock until retirement.  Bence Decl. Ex. 1 (list of shareholders).  Plaintiff points to the 2003 Swenson Memo as promoting the economic incentives for employees to treat the Stock Plan as a retirement benefit.  SAC ¶ 20; Giltner Decl. Ex. C.

This argument fails because Plaintiff misstates the facts.  *Sprewell*, 266 F.3d at 988.  The Swenson Memo does not describe the Stock Plan as a retirement plan.  Instead, the Memo repeats that the purpose of the Stock Plan is "a wealth creation vehicle" for long-term employees (and to raise capital for Booz Allen).  Giltner Decl. Ex C. at 16;  *id.* at 19-20 (showing value for executives with careers of ten to twenty-five years); *id.* at 20 ("For many partners and particularly those who stay with us 10+ years, the stock program serves as an attractive wealth accumulation vehicle.").  As stated above, that some executives may have used the Stock Plan as a source of retirement funds does not necessarily result in ERISA coverage.

Finally, Plaintiff argues that Booz Allen provided loans for executives to buy stock.  *E.g.*, SAC ¶ 333.  That Booz Allen provided loans to executives to participate in the Stock Plan does not advance Plaintiff's position.  The Swenson Memo explains that Booz Allen relied on executives to buy stock because their investments provided capital for the business.  Thus, the company had a strong incentive to make it easy for executives to buy shares.

In summary, the weight of case authority demonstrates that BAH's Stock Plan is not covered by ERISA.  Plaintiff has not cited a single case, published or unpublished, that has held in his favor on a similar fact pattern.  The *Holzer* decision is distinguishable because the plan in that case did not contain an express declaration of its purpose and because the

09CV0652

plaintiff had alleged "surrounding circumstances" that created a question of fact as to the "exact nature of the Plan." *Holzer v. Prudential Equity Grp. LLC*, 458 F. Supp. 2d 587, 591-93 (N.D. Ill. 2006).  By contrast, the Plan before the Court is, without a doubt, a bonus plan.[3]  *Hahn*, 99 F. Supp. 2d at 279 ("Where, as here, the plan proclaims its intent to provide bonus compensation, a pension plan will not be found.").

Because Plaintiff fails as a matter of law to state an ERISA claim, the Court dismisses counts six, seven, nine, and ten with prejudice.

## IV.  RICO

"The Racketeer Influenced and Corrupt Organizations Act ('RICO') provides a private civil action to recover treble damages for injury 'by reason of a violation of' its substantive provisions." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 481 (1985) (quoting 18 U.S.C. § 1964(c)).  "A civil RICO claim requires allegations of the conduct of an enterprise through a pattern of racketeering activity that proximately caused injury to the plaintiff." *Swartz v. KPMG LLP*, 476 F.3d 756, 760-61 (9th Cir. 2007); *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (identifying elements).

In 1995, Congress enacted the Private Securities Litigation Reform Act which amended the RICO statute to eliminate securities fraud as a predicate offense capable of supporting a RICO claim.  The RICO statute now provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." 18 U.S.C. § 1964(c).  This bar prevents a plaintiff from artfully pleading other acts (such as mail fraud or extortion) when the wrongful act is based on conduct "in connection with" the purchase or sale of stock that would have been

---

[3]The Court rejects Plaintiff's argument that this issue must await a summary judgment motion. Many courts have decided whether a plan is covered by ERISA in the context of Rule 12(b)(6) by examining the terms of the plan document. *E.g.*, *Oatway*, 325 F.3d at 185-86 & nn.1 & 3; *Hahn*, 99 F. Supp. 2d at 277; *Goodrich v. CML Fiberoptics, Inc.*, 990 F. Supp. 48 (D. Mass 1998).

Though an unpublished decision, Plaintiff's case is strikingly similar to *Houston v. Aramark Corp.*, No. 04-1103, 112 Fed. Appx. 132, 2004 WL 2203981 (3d Cir. filed Oct. 1, 2004).  There, the company was purchased after plaintiff had retired which doubled the value of the stock, and "[s]ince then, instead of seeing his $2.4m cup as overflowing, Houston viewed his $5.4m cup as less than half full." *Id.* at 135, *2.  The Third Circuit affirmed the district court's dismissal of the ERISA claim on a Rule 12(b)(6) motion.

09CV0652

1   actionable as securities fraud.  *Swartz*, 476 F.3d at 761; *accord Bald Eagle Area Sch. Dist.*

2   *v. Keystone Fin., Inc.*, 189 F.3d 321, 329-30 (3d Cir. 1999) ("a plaintiff cannot avoid the

3   RICO Amendment's bar by pleading mail fraud, wire fraud and bank fraud as predicate

4   offenses in a civil RICO action if the conduct giving rise to those predicate offenses

5   amounts to securities fraud").

6        The Court dismissed the RICO claims in the FAC for several reasons, including that

7   "[t]he clear gravamen of Plaintiff's RICO claim is that he was deprived of the benefit of

8   selling his stock to Carlyle at a premium price in 2008 because Booz Allen bought his

9   shares in 2007."  Order at 23.  The Court allowed Plaintiff leave to amend because he

10  asserted that he could save the RICO claims.

11       Defendants argue that the amended pleading did not successfully disconnect

12  Plaintiff's RICO claims from a securities claim.  Defendants note that, as in the flawed

13  FAC, Plaintiff continues to calculate his RICO damages based upon the value of Booz

14  Allen stock when Carlyle bought the government division.  *E.g.*, SAC ¶¶ 311-12, 318, 329,

15  333, 347.

16       The Court agrees that the fatal flaw remains.  There may be other flaws in the RICO

17  causes of action, but for simplicity, the Court discusses only the securities bar.  Plaintiff's

18  SAC, like the FAC, is plainly premised on securities fraud.  Plaintiff alleges a scheme "in

19  connection with" the sale of BAH stock.  *Swartz*, 476 F.3d at 761.  The securities were not

20  "incidental" to the scheme.  *Id.*  If BAH had not repurchased Plaintiff's shares in March

21  2007 for $148 per share, pursuant to its contractual right in the Stock Plan, Plaintiff would

22  not have realized the alleged loss of "millions of dollars," which he calculates based upon

23  the Carlyle Group's payment of nearly $800 per share in July 2008.  *E.g.*, SAC ¶¶ 5, 90,

24  103, 347, 349, 358; *Swartz*, 476 F.3d at 761.  Plaintiff's primary theory of wrongdoing

25  depends upon BAH's re-purchase of his stock.  *Bixler v. Foster*, 596 F.3d 751, 760 (10th

26  Cir. 2010) (applying *Swartz* and *Bald Eagle* to merger).

27       Because Plaintiff has already been given an opportunity to amend and has not

28  avoided the bar, the Court grants Defendants' motion to dismiss the RICO counts (counts

1   one, two, three, four, and five) with prejudice.  *In re VeriFone Sec. Litig.*, 11 F.3d 865, 872

2   (9th Cir. 1993).

3   **V.   <u>Securities Fraud</u>**

4          Unlike the FAC, which named individual directors as defendants, the SAC names

5   the corporation as the sole defendant in the securities fraud claim.  The FAC relied on a

6   failure to disclose, or silence, whereas the SAC adds an allegation that Booz Allen, through

7   its agent, CEO Shrader, made an affirmative misstatement of fact.  The SAC alleges that

8   Booz Allen violated the federal securities law by (1) not disclosing, at the time Plaintiff

9   retired (March 2005), that the company had discarded its longstanding policy to remain as

10  "One Firm," SAC ¶ 394, and (2) misrepresenting that the firm adhered to that policy in an

11  email message from Defendant Shrader on December 14, 2004.  *Id.*; *see id.* ¶ 330.  He

12  alleges Booz Allen should have requested that Plaintiff sign a confidentiality agreement

13  about the company's plan to split up the company and sell the government division.  *Id.* ¶

14  395.

15         Plaintiff connects the alleged fraud "with the sale of a security" by relying on the

16  terms of the Stock Plan.  SAC ¶ 401.  His decision to retire was "in connection with" Booz

17  Allen's re-purchase of his 30,500 shares, two years after he left the company, as established

18  by the Stock Plan.  *See Falkowski v. Imation Corp.*, 309 F.3d 1123, 1130 (9th Cir.),

19  *amended by*, 320 F.3d 905 (9th Cir. 2002), *abrogated on other grounds as recognized by*

20  *Proctor v. Vishay Intertech. Inc.*, 584 F.3d 1208 (9th Cir. 2009).  Courts have held that

21  retirement that triggers a stock purchase satisfies that element of a securities claim.  *E.g.*,

22  *Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429, 436-39 (7th Cir. 1987) (stock ownership tied

23  to employment contract was "indirectly or bound up with" decision to remain or depart

24  company), *cited with approval by McCormick v. Fund Am. Cos., Inc.*, 26 F.3d 869, 876

25  (9th Cir. 1994).

26         Plaintiff alleges he would have fought the recommendation to retire had he known

27  of Shrader's plan to sell to the government division to a private equity firm.  SAC ¶¶ 396,

28  398.  Had Plaintiff remained an employee through July 2008, he too would have sold his

1   shares to Carlyle for a huge profit.

2       "To state a claim under § 10(b) of the Securities and Exchange Act, 15 U.S.C. §

3   78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must show that there has been a

4   misstatement or omission of material fact, made with scienter, which proximately caused

5   his or her injury." *McCormick*, 26 F.3d at 875-76; *Dura Pharms., Inc. v. Broudo*, 544 U.S.

6   336, 341-42 (2005); *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996). Rule 9(b)

7   requires a plaintiff to allege fraud with particularity. *In re Stat Elecs. Sec. Litig.*, 89 F.3d

8   1399, 1401 (9th Cir. 1996). The claim must also "state with particularity facts giving rise

9   to a strong inference" that the defendant acted with the intent to defraud or with deliberate

10  recklessness. 15 U.S.C. § 78u-4(b)(2); *No. 84 Empl'r-Teamster Joint Council Pension*

11  *Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

12      The Court accepts as true the Plaintiffs' allegations in ruling on a motion to dismiss;

13  however, with regard to the element of scienter, "the court must consider *all* reasonable

14  inferences to be drawn from the allegations, including inferences unfavorable to the

15  plaintiffs." *Gompper v. VISX, Inc.*, 298 F.3d 893, 897 (9th Cir. 2002). "[T]he court

16  ultimately reviews the complaint in its entirety to determine whether the totality of facts

17  and inferences demonstrate a strong inference of scienter." *Id.* at 895. The "inference of

18  scienter must be more than merely plausible or reasonable – it must be cogent and at least

19  as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor*

20  *Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007); *Zucco Partners, LLC v. Digimarc Corp.*,

21  552 F.3d 981, 987, 989-92 (9th Cir. 2009).

22      Without discussing all of the ways in which Plaintiff's SAC has failed to cure the

23  deficiencies of the FAC, the Court agrees with Defendants that the entirety of the SAC does

24  not contain sufficient facts to create a strong inference of securities fraud and fails to

25  identify a material fact in the relevant time period.

26      **A.  <u>Material Fact</u>**

27      Plaintiff's theory is that Booz Allen knew it was going to sell the government

28  division to the Carlyle Group and that the company should have told him about the plan

- 17 -                                    09CV0652

1   because that future transaction would dramatically increase the value of Plaintiff's 30,500

2   shares.  Plaintiff's theory falls apart, however, when the chronology of events is laid out.

3   Plaintiff has not identified any facts that Carlyle had any interest in buying Booz Allen

4   until late 2007 or early 2008 – well after Plaintiff left the firm.[4]

5         The SAC does contain vague allegations that Shrader and his inner circle devised

6   the plan several years before Plaintiff retired.  Plaintiff states that his former colleagues

7   agree "that Shrader had been planning and maneuvering to accomplish a self enriching

8   transaction for a number of years."  SAC ¶ 105; *e.g.*, *id.* ¶ 12 (directors played golf together

9   and secretly conducted business).  The SAC alleges that Defendant Shrader, who was

10  elected CEO in 1999, first conceived his deceptive scheme as early as 2000 or 2003.  *Id.* ¶

11  31 (in 2000, Shrader mentioned that management consulting firms had been acquired for

12  "huge premiums"); *id.* ¶ 42 (in 2003, Shrader modified the Stock Plan); *id.* ¶ 183 (Shrader

13  extended his term as CEO in 2004 for another six years).

14        Even if Shrader first had the idea to sell the government division in 2000, the SAC

15  alleges that Shrader kept his plan a secret.  Plaintiff alleges that Shrader did not disclose his

16  secret plan to anyone outside his inner circle.  *Cf.* SAC ¶ 12 ("Appleby, Garner, Doughty,

17  Strickland and Shrader . . . shared information amongst themselves which they would not

18  reveal to other [executives]" and they "conducted BAH business without other partners'

19

20        [4] Plaintiff must show that the buyout by Carlyle would probably occur because this
transaction increased the value of Booz Allen's stock.  *McCormick*, 26 F.3d at 876-77; *Brody*
21  *v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006-07 (9th Cir. 2002).  Defendants argue that
Plaintiff made his investment decision in September 2003 when he received the negative
22  performance review and the recommendation to retire.  Defendants ask the Court to use this
earlier date to access the materiality of the Carlyle transaction.  While it is possible that
23  Defendants' position has merit, the Court does not need to decide that question to resolve the
motion to dismiss.  *See Michaels v. Michaels*, 767 F.2d 1185, 1195 (7th Cir. 1985) (focusing
24  on time plaintiff committed himself to sell his stock by signing agreement to sell his shares,
though he delivered them to the company at a future date).  For the purpose of this motion, the
25  Court assumes, without deciding, that March 31, 2007 is the relevant date.  That is the date
when Booz Allen actually paid Plaintiff for his 30,500 shares.  *See McCormick*, 26 F.3d at 875
26  (focusing on date the corporation repurchased a retiring employee's shares).
        The Court notes that another district court denied a motion to dismiss the securities
27  fraud claim of two other Booz Allen executives.  *Nemec v. Shrader*, Nos. 09cv7466-LAK &
09cv8290-LAK (S.D.N.Y. Sept. 27, 2010). The facts are distinguishable because Booz Allen
28  redeemed those shares in April 2008 – one month before Carlyle signed the contract and Booz
issued the Offering Circular.  *See SAC ¶¶ 208-14.*

knowledge" during weekend golf games); *id*. ¶ 35 (directing that market value "be kept secret"); *id.* ¶ 260 (alleging Shrader took steps "in strictest secrecy as possible").

There are sparse facts of any actual conduct by Shrader.  "In 2000, Shrader ordered the Finance Committee to conduct a study of the market value of BAH."  *Id.* ¶ 35.  The SAC alleges Shrader began taking "necessary steps" to force senior executives to retire in 2002.  *Id.* ¶¶ 52 & 173 ("during 2002-2006 period, Shrader . . . began to force experienced managers out" despite growth of company); *id.* ¶ 206 (in June 2006, Shrader began to force out senior executives).  Plaintiff cites four other executives who were forced to retire in 2004.  *Id.* ¶¶ 113-59.  Plaintiff alleges that Shrader targeted executives who might oppose a plan to split up and sell the government division in an effort to ensure that he would have the necessary votes to enact his plan.  *Id.* ¶ 174.

The SAC further alleges that *another* buyer made an unsolicited offer in December 2006.  *Id.* ¶ 244.

Plaintiff has omitted several fact allegations that had been included in the FAC concerning of the timing of the leveraged buyout, however, he repeats the concrete allegation that Booz Allen closed the Carlyle deal on July 31, 2008.[5]  SAC ¶ 299; *see* Bence Decl. Ex. 2 (Booz Allen reports on a SEC form that it signed the agreement with Carlyle on May 15, 2008); *but see* SAC ¶ 254 (alleging public announcement in January 2008).  The SAC is virtually silent on when Carlyle commenced negotiations or when the negotiations developed into a probable event.  *Id.* ¶ 172 ("in 2007, management was in the midst of selling the Government business").  But by "November 2007, BAH had selected the Carlyle Group as the successful bidder."  *Id.* ¶ 208.

### 1.  <u>The Alleged Omission</u>

The conclusory allegations that Shrader had a desire or plan to sell the government division to someone at some future date do not satisfy Plaintiff's obligation to identify material information as to Carlyle's ultimate purchase in July 2008.  *Panfil v. ACC Corp.*,

---

[5] Plaintiff conveniently omitted the factual allegation that Carlyle had developed its bid "in the months leading up to November, 2007."  FAC ¶ 389-90.

768 F. Supp. 54, 58 (W.D.N.Y.) ("The mere 'intention' to "pursue" a possible merger at some time in the future is not material information), *aff'd*, 952 F.2d 394 (2d Cir. 1991). Without a buyer, Shrader's unilateral plan was immaterial.  *L.L. Capital Partners, L.P. v. Rockefeller Ctr. Props., Inc.*, 921 F. Supp. 1174, 1180-81 (S.D.N.Y. 1996) ("the unrequited desire of one party to engage in a transaction with another" is not material).

Undisclosed information concerning future events must be reasonably certain to occur before a company must disclose it.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 504 (9th Cir. 1992); *Vaughn v. Teledyne, Inc.*, 628 F.2d 1214, 1221 (9th Cir. 1980); *see Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) (materiality can be determined on a Rule 12(b)(6) motion).  "The probability of merger prior to any contact with potential suitors – prior to any evidence that a suitor is in an any way interested in a merger – is too remote." *Panfil*, 768 F. Supp. at 58.

The SAC contains no factual allegations that Carlyle explored the idea, scheduled a meeting, initiated negotiations, or made an offer during the time period when Plaintiff retired and Booz Allen repurchased his stock.  *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 979 (9th Cir. 1999) (affirming entry of judgment on the pleadings because tentative discussions of a potential transaction is not a material fact); *Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc.*, 723 F. Supp. 976, 982-85 (S.D.N.Y. 1989) (dismissing complaint because hypothetical takeover that "actually had not crystallized into an offer" was not material fact).  Plaintiff's silence on these crucial facts is fatal.  Plaintiff's amendments have not cured his failure to allege that Booz Allen had material information about preliminary or serious negotiations with Carlyle in March 2007(when the company timely exercised its automatic right to re-purchase Plaintiff's shares) that it should have disclosed.

## 2.  The Alleged Misrepresentation

Plaintiff's reliance on an email from 2004 is equally flawed.  Plaintiff does not quote the email, but he apparently contends Shrader repeated that he adhered to "fundamental long standing BAH policies, in particular, that BAH would remain as 'One Firm' and not

1 split up, and that BAH would not be sold, but would be 'Always Owned By the Partners.'"

2 SAC ¶¶ 394, 401.  This email is several years removed from the Carlyle transaction, and

3 the lack of temporal proximity diminishes the inference that it was false when made.

4 *Yourish v. Cal. Amplifier*, 191 F.3d 983, 994-95 (9th Cir. 1999) (information must be

5 contemporaneous with alleged false statement);  *In re Glenfed, Inc. Sec. Litig.*, 42 F.3d

6 1541, 1547-49 (9th Cir. 1994) (plaintiff must allege with particularity the circumstances

7 constituting the fraud, that is, more than the "neutral facts necessary to identify the

8 transaction").  Plaintiff speculates that Shrader wanted to sell the government division but

9 provides no facts that the Carlyle transaction was likely to occur in December 2004.

10 *Ronconi v. Larkin*, 253 F.3d 423, 429-34 (9th Cir. 2001).

11 **B. <u>Scienter</u>**

12 The SAC contains assumptions, speculations, and conclusions about Defendant

13 Shrader's motives.  The allegations do not create a cogent or compelling inference that the

14 CEO acted with the required state of mind.  *In re Daou Sys., Inc.*, 411 F.3d 1006, 1014,

15 1022 (9th Cir. 2005) (generic allegations that defendants had motive to commit fraud are

16 insufficient to plead scienter) (citations omitted); *Lipton v. PathoGenesis Corp.*, 284 F.3d

17 1027, 1034-35 & n.13 (9th Cir. 2002).

18 The complaint lists ordinary business and employment decisions and labels them

19 fraudulent.  *Lipton*, 284 F.3d at 1038 (generalized assertions that "directors possess motive

20 and opportunity to enhance a company's business prospects" are inadequate to plead

21 scienter).  At best, the facts show Shrader wrongfully terminated several older employees

22 and had a strong desire to sell part of the company for profit.  *Zucco*, 552 F.3d at 1004-05

23 (generalized allegation of personal financial gain, without more, does not meet heightened

24 pleading standard for scienter); *Semegen*, 780 F.2d at 731 (plaintiffs who "set forth

25 conclusory allegations of fraud . . . punctuated by a handful of neutral facts" do not satisfy

26 Rule 9(b)).  Plaintiff concludes that the employment decisions were based on a master plan

27 to force out large shareholders and those who would oppose a plan to sell the government

28 division.  An equally plausible and innocent explanation is that it is natural attrition for a

dozen of the two hundred senior executives to retire over a four-year period.  Similarly,

Shrader's intention to sell part of the company at a profit is a rational business decision.  As

the Delaware Supreme Court held, the sale to Carlyle in 2008 benefitted all similarly-

situated shareholders equally.  *Nemec*, 991 A.2d at 1127-30.  The working directors could

not show favoritism to retired executives.  *Id.*  Booz Allen complied with the plain

language of the Stock Plan to repurchase shares from former executives after two years and

exercised its right at the time most advantageous to the company.  *Id.*  Plaintiff's personal

disappointment, in hindsight, does not create an inference that the conduct was undertaken

with an intent to commit securities fraud.  *Ronconi*, 253 F.3d at 429-34 & n.12; *see supra* p.

14 n.5 (citing *Houston*).

Taking into consideration the entirety of the complaint and the inferences both

favorable and unfavorable to Plaintiff, the Court finds no plausible inference of scienter.

*Tellabs*, 551 U.S. at 314; *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049,

1065-69 (9th Cir. 2008).

For these reasons, the Court **GRANTS** the motion to dismiss the securities claim

with prejudice (count eight).  *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d

385, 391 (9th Cir. 2002).

**VI.  Breach of Contract**

Plaintiff's amended breach of contract claim alleges that the company "was

obligated to provide Rich with an assessment of his performance that was based upon and

consistent with the opinion and recommendation of numerous co-workers."  SAC ¶ 440;

*see id.* ¶ 434 (alleging a "series of writings, policy guides, correspondence and other

verbalizations" as containing the terms); *id.* ¶ 439 (alleging Plaintiff was not an at-will

employee).  Plaintiff contends that Booz Allen breached the contract in July and/or

September 2003 when it gave him a negative assessment and required him to retire within

two years.  *Id.* ¶¶ 66-87, 94-102, 437.  "The [negative] Assessment Review of Plaintiff in

2003 was not based upon and consistent with the opinions and recommendations of Rich's

co-workers; in fact, the recommendation was directly contrary to such opinions and

1    recommendations." *Id.* ¶ 442.  He further contends that Defendant Shrader attended the

2    "Assessment Review Group" meeting, criticized Plaintiff's performance on the Warbreaker

3    Program, and urged that he be removed as an officer.  *Id.* ¶ 77.  The SAC alleges that

4    Shrader's depiction of Plaintiff's performance on Warbreaker was false because it

5    contradicted a prior, contemporaneous, positive assessment.  *Id.* ¶¶ 78, 84; *see also id.* ¶¶

6    79-81 (alleging Defendants Garner and Doughty also knew the recommendation to retire

7    was based on false statements).

8        When Plaintiff was confronted with the negative assessment on September 30, 2003,

9    he tried to obtain an explanation, but was rebuffed.  *Id.* ¶ 96-102.  Plaintiff contends the

10   breach was concealed from him because assessments are strictly confidential, and that he

11   did not learn of the deceit until he met with former colleagues at a reunion in March 2009.

12   *Id.* ¶¶ 74, 83, 93, 104-12.  At that time, employees broke the confidentiality obligation and

13   explained the true circumstances of the negative performance.  Plaintiff realized that his

14   retirement, and the forced retirements of other senior executives, "might be connected with

15   the shocking decision to split-up and sell the firm" to the Carlyle Group.  *Id.* ¶ 103.

16       **A.  <u>Statute of Limitations</u>**

17       Plaintiff filed his original complaint on April 1, 2009.  Defendants argue that the

18   breach of contract accrued in September 2003, when Plaintiff received the assessment that

19   recommended he retire.  They contend the claim is barred by the four year statute of

20   limitations which expired in September 2007.  Cal. Civ. Proc. Code § 337; *Jablon v. Dean*

21   *Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) ("If the running of the statute is apparent

22   on the face of the complaint, the defense may be raised by a motion to dismiss.").

23       That argument had merit when applied to the FAC; however, Plaintiff has amended

24   the pleading.  In his SAC, Plaintiff invokes the discovery rule to postpone the date the

25   limitations began to run to July 2008, which he contends is when he knew or should have

26   known, with the exercise of reasonable diligence, of the wrongful conduct at issue.  *Fox v.*

27   *Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 920 (Cal. 2005); *Kline v. Turner*, 105 Cal. Rptr.

28   2d 699, 702-03 (2001) (delayed discovery rule provides cause of action does not accrue

1    until plaintiff suspects or should have suspected defendant's wrongdoing).

2          The delayed discovery rule is a creature of tort law.  It applies to contract claims

3    only when plaintiff shows the defendant concealed its improper conduct, the injury or the

4    act causing it would be difficult for plaintiff to detect, the defendant was in a superior

5    position to comprehend the act and injury, and the defendant had reason to believe the

6    plaintiff remained ignorant he had been wronged.  *Gryczman v. 4550 Pico Partners, Ltd.*,

7    131 Cal. Rptr. 2d 680, 681-83 (2003); *April Enters., Inc. v. KTTV*, 195 Cal. Rptr. 421, 147

8    Cal. App. 3d 805, 825-33 (1983) (applying discovery rule to breach of contract action when

9    breach committed in secret and plaintiff would not reasonably discover harm until a future

10   time).  When the complaint shows on its face that the cause of action is time barred, the

11   plaintiff must specifically plead facts to show the time and manner of discovery and the

12   inability to have made the discovery earlier despite reasonable diligence.  *Fox*, 110 P.2d at

13   920-21.

14         The SAC alleges facts that trigger the delayed discovery rule.  *El Pollo Loco, Inc. v.*

15   *Hashim*, 316 F.3d 1032, 1040 (9th Cir. 2003); *Weatherly v. Universal Music Pub. Grp.*, 23

16   Cal. Rptr. 3d 157, 161-62 (Ct. App. 2004).  Plaintiff alleges that he was hindered in his

17   investigation by Defendants' misrepresentations.  *Jablon*, 614 F.2d at 682 ("When a motion

18   to dismiss is based on the running of the statute of limitations, it can be granted only if the

19   assertions of the complaint, read with the required liberality, would not permit the plaintiff

20   to prove that the statute was tolled.") (citation omitted).

21         **B.  <u>Elements</u>**

22         In their prior motion to dismiss, Defendants successfully attacked the breach of

23   contract claim for failing to show that the breach was the proximate cause of Plaintiff's

24   damage.  Plaintiff had included facts in the FAC that demonstrated that there was an

25   intervening event that broke the chain of causation.  The FAC stated that after Plaintiff had

26   been told he should retire within two years, he elected to retire in March 2005.  It also

27   alleged that, in October 2004, the company stated it would rescind the recommendation to

28   retire if Plaintiff agreed not to accelerate his retirement date but instead remain with the

company through September 2005.  The FAC stated that Plaintiff rejected the offer of reinstatement, and, as a result, he stated that his retirement in March 2005 was wholly voluntary.  Order at 6.  The Court gave Plaintiff leave to amend, and Plaintiff omitted that language.  The SAC amended the description the discussion.  The SAC now alleges that Defendant Doughty "suggested" that BAH "could" change the retirement recommendation, but that the discussion was not finalized into an actual offer.  SAC ¶¶ 397 & 448.

Despite Defendants' frustration with Plaintiff's shifting explanation, he is, at this early stage of the litigation, allowed to amend his pleadings.  As written, the SAC alleges that Defendants' breach caused Plaintiff's damages.

Judge Anello also questioned whether Plaintiff could recover contract damages measured by the price Carlyle paid for Booz Allen shares.  The FAC relied on the written employment contract formed in 1987.  The Court noted that Plaintiff could recover only damages that were foreseeable at the time the contract was formed but the leveraged buyout happened twenty years after Plaintiff was hired.  Defendants argue this flaw remains in the SAC.

The SAC, however, relies on implied policies to honestly assess Plaintiff's performance in 2003, and Plaintiff now seeks the salary that he would have earned had he not retired.  SAC ¶ 450.  Accordingly, Defendants argument fails.

The Court **DENIES** the motion to dismiss the breach of contract cause of action alleged against Defendant Booz Allen.

**VII.  <u>Tortious Interference with Contract</u>**

Plaintiff alleges that Defendants Shrader and Garner interfered with his employment contract with Booz Allen when they made false statements about his job performance in the September 2003 assessment meeting.  SAC ¶¶ 417-27.

The FAC included the same cause of action, but Judge Anello dismissed it because the directors were agents of Booz Allen.[6]  A party (or its agent) to the contract at issue

---

[6] Judge Anello dismissed the claim for the separate reasons that it was barred by the statute of limitations and Plaintiff admitted he broke the chain of proximate cause by deciding
(continued...)

1   cannot be liable on an interference theory.  *Woods v. Fox Broad. Sub., Inc.*, 28 Cal. Rptr. 3d

2   463, 467-70 (Ct. App. 2005); *Kelly v. Gen. Tel. Co.*, 186 Cal. Rptr 184, 188 (Ct. App.

3   1982).  Only "a stranger to a contract may be liable in tort for intentionally interfering with

4   the performance of the contract."  *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d

5   1118, 1126, 791 P.2d 587 (Cal. 1990) (citations omitted).

6        Judge Anello granted Plaintiff leave to amend the claim, and the SAC adds

7   allegations that Shrader and Garner took these actions to "enrich themselves" and to the

8   detriment of Booz Allen.  *Id.* ¶¶ 428-330.  Plaintiff thus relies on the exception to the

9   general rule.  When an officer, majority shareholder, or other agent of a corporation acts

10  solely in its own self interest, and against the interest of its principal, such a defendant may

11  be sued for tortious interference with the entity's contracts.  *Wanlan v. Los Gatos Lodge,*

12  *Inc.*, 281 Cal. Rptr. 890, 899 (1991); *Shapoff v. Scull*, 272 Cal. Rptr. 480, 484, 487-88

13  (1990), *overruled on other grounds by Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*,

14  869 P.2d 454 (Cal. 1994).

15       The Court concludes that Plaintiff has sufficiently plead the exception by alleging

16  that these two senior executives were acting in their personal financial interest.  *Doctors'*

17  *Co. v. Superior Court*, 49 Cal. 3d 39, 47 (1989).  Plaintiff contends Defendants forced him

18  to retire to increase their own payout.  *E.g.*, SAC ¶¶ 2-3, 6-7, 105, 312, 316, 420-21, 426.

19  He alleges that his forced retirement was contrary to the company's best interest.  *E.g.*, *id.*

20  ¶¶ 91, 109, 427-29.  He also alleges that these directors fixed the sale to Carlyle at half-

21  price of the true value of the government division.  *E.g.*, *id.* ¶¶ 5, 289-93.  The Court must

22  accept these factual allegations as true.[7]  *Gray v. First Winthrop Corp.*, 754 F. Supp. 157,

23

24  _____

    [6](...continued)

25  to retire voluntarily.  As discussed above in relation to the breach of contract claim, however,
    the SAC has cured those deficiencies.  Plaintiff now pleads facts to invoke the delayed

26  discovery rule on this tort claim, and he omitted language that he "voluntarily" retired.

27  [7]The officer may raise the defense that his conduct is protected by a privilege.  *See*
    *Woods*, 28 Cal. Rptr. 3d at 473; *L. A. Airways, Inc. v. Davis*, 687 F.2d 321, 328 (9th Cir. 1982)

28  (holding, in a mixed-motive case, where "an advisor is motivated in part by a desire to benefit
    his principal, his conduct in inducing a breach of contract should be privileged").  But Plaintiff
    is not required to disprove an affirmative defense in order to defeat a motion to dismiss.

161 (N.D. Cal. 1990) (denying motion to dismiss, because complaint alleged facts that defendants stood to benefit from their alleged acts of interference with contract of principal).

The Court **DENIES** Defendants Shrader's and Garner's motion to dismiss the tortious interference with contract cause of action.

<u>CONCLUSION</u>

For the reasons stated herein, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss this action.  [Doc. No. 48] The Court dismisses the RICO, ERISA, and securities fraud claims with prejudice.  Plaintiff's surviving claims are (1) count 11, a tortious interference with contract against Defendants Ralph Shrader and Joseph E. Garner and (2) count twelve, a breach of contract claims against Defendant Booz Allen Hamilton, Inc.  The Clerk shall terminate this case with prejudice as to all other Defendants.

**IT IS SO ORDERED.**

DATED:  September 22, 2011

_____
Hon. Anthony J. Battaglia
U.S. District Judge

09CV0652